857 So.2d 1234 (2003)
Roy W. HALL and Helen Hall
v.
The FOLGER COFFEE COMPANY and XYZ Insurance Company.
Folger Coffee Company
v.
Roy W. Hall and Helen Hall.
Nos. 2002-CA-0920, 2002-CA-0921
Court of Appeal of Louisiana, Fourth Circuit.
October 1, 2003.
Writ Denied October 17, 2003.
Rehearing Denied November 14, 2003.
*1237 Dominic J. Gianna, John D. Person, Marianne Garvey, Jennifer Caulfield, Jeffrey *1238 A. Raines, Middleberg, Riddle & Gianna, New Orleans, LA, for Appellee, The Folger Coffee Company.
Ford J. Dieth, Marsha B. Martin, Dieth and Martin, Metairie, LA, for Appellants, Roy and Helen Hall.
Isaac H. Soileau, Jr., Logan & Soileau, LLC, New Orleans, LA, for Intervenor-Appellant.
(Court composed of Chief Judge WILLIAM H. BYRNES, III, Judge PATRICIA RIVET MURRAY, Judge MICHAEL E. KIRBY).

OPINION ON DEFAULT JUDGMENT APPEAL
PATRICIA RIVET MURRAY, Judge.
In this personal injury case, the plaintiffs, Roy and Helen Hall, obtained a default judgment against the defendant, Folger Coffee Company, awarding special damages of $510,572.79, general damages of $400,000, and loss of consortium damages of $45,000. Upon receiving notice of the default judgment, Folger filed both a timely appeal and a nullity action. In Hall v. Folger Coffee Co., XXXX-XXXX, XXXX-XXXX (La.App. 4 Cir. 4/9/03), 843 So.2d 623 ("Hall"), we reversed the trial court's judgment nullifying the default judgment and gave Folger the opportunity to brief the preserved issues pertaining to its timely filed default judgment appeal. In its brief, Folger argues that the trial court erred in confirming the default judgment because it was Mr. Hall's statutory employer and thus immune from tort liability. Alternatively, Folger argues that the Halls failed to establish a prima facie case of liability or damages against it. Finding neither argument persuasive, we affirm.

FACTS
On November 15, 1994, Mr. Hall was employed by Larry Vasser Leasing Trucking Company ("LVL") as a truck driver.[1] LVL had a contract with a can manufacturer to deliver empty coffee cans imprinted with the Folger's logo and label to Folger's warehouse located at 14601 Old Gentilly Boulevard, New Orleans. Mr. Hall's job included making several daily deliveries of such empty cans to Folger's warehouse.
For delivery purposes, the empty coffee cans were packaged in layers on pallets with cardboard between the layers. The cans were secured to the pallets by industrial plastic straps. Each pallet measured about four and one half feet square, and the cans were stacked on the pallets about eight feet high. The pallets were placed in LVL's trailers in rows of two with about eleven pallets on each side, making each load consist of about twenty-two pallets. There were manual rollers in the trailer, underneath the two rows of pallets, to assist in unloading.
Upon arrival at Folger's warehouse, the LVL drivers were required to perform certain tasks. First, the driver had to back the trailer into a designated bay and align it so that the two rows of pallets in the trailer lined up with a two-lined, automated conveyor belt system in Folger's plant. Second, the driver had to pull the pallets out of the trailer onto the automated conveyor belt. Finally, the driver had to cut the plastic straps off the pallets to free up the cans for the next step in the manufacturing-filling process. Because Folger kept the shears used to cut the straps affixed to its plant, the driver was required to cut the straps after moving the *1239 pallets onto the automated conveyor belt. The driver would cut the straps off on one side of the conveyor belt and then cross over the conveyor to cut the straps on the other side.
Explaining why the driver had to climb onto the conveyor belt to get to the other side to perform this task, the Hall's expert, Charles Prewitt, a mechanical engineer, stated in his affidavit that "[t]he only way for the driver to cross the conveyor was to climb a set of stairs about 2' high to get on the conveyor, then step on a small fold-down `kickplate' to walk across. When the truck was empty and all the pallets were pushed out, the `kickplate' was blocked and could not be lowered, requiring the individual to step on the conveyor." Likewise, Mr. Hall's co-worker, Mr. Pearson stated in his affidavit that the kick plate "was a small plate of metal or wood which could be kicked down to assist in walking over the rollers." He further stated that "when the pallets were on the conveyor, they effectively blocked the use of this largely ineffective deviceand it was when the pallets were fully unloaded from the truck and on the conveyor rollers that the driver was required to climb over the rollers from one side of the conveyor to the other to cut the straps on the pallets." Hence, Mr. Pearson stated that the drivers' final task at Folger's plant was to climb "on the conveyor superstructure and over the steel rollers to the other side, cut the straps on that side of the conveyor (a different set of pallets), climb back up on the conveyor superstructure and cross to the original side and return to the door, pick up his paperwork and exit the plant."
At the time of the accident, Mr. Hall had unloaded his trailer and was in the process of performing the final task of crossing the conveyor belt to cut the straps when he was thrown to the ground.[2] According to Mr. Hall, no one witnessed his fall. Mr. Hall attributed his fall to the sudden, unexpected movement of the conveyor belt. He further attributed the movement of the conveyor belt to the Folger's operator starting it. That operator, who was stationed at a distance from the unloading area, was the only Folger employee in the unloading area. A cement column that measured about eighteen inches by two feet blocked the operator's view of the area. The operator's view was also blocked when there were pallets on the adjoining conveyor belt system. The operator also could not hear a driver's call for help given the loud noise in the warehouse.
Mr. Hall testified that there were times in the past when the operators started the conveyor rollers without him knowing they were going to do so and that both he and other drivers had slipped on the conveyor system. He also indicated that Folger was aware that people had fallen off of this conveyor system during the offloading process and that Folger previously had a paper posted near the conveyor belt that instructed the drivers regarding their tasks.
Mr. Hall's testimony was corroborated by an affidavit of his co-worker, Mr. Pearson, who attested that the operator's view of the drivers was "obliterated by a pillar and stacks of cans on other conveyors." Mr. Pearson further attested that the conveyor area was not well lighted and that the noise level was so high that "a yell for *1240 help by a driver would not have been heard by the distant human operator." He still further attested that "the off button for the conveyors was in a position on a wall at a distance too remote for a person on the conveyor superstructure and in distress to reach it." Mr. Pearson also attested that when a driver was climbing over the conveyor system, there were times when "the entire line would, without warning, begin to move of its own accord;" he indicated that he himself was caught in the rollers on one occasion due to such sudden, unforeseen movement of the conveyor belt. Mr. Pearson attested that he "was not surprised when Mr. Hall told [him] of his injury as he is not the only driver who has been injured in conjunction with delivery of cans at the Folger plant."
Mr. Prewitt, the Halls' safety engineer expert, likewise noted in his affidavit that the conveyor system was operated intermittently without warning by a Folger's operator who has limited visibility of the unloading area. Mr. Prewitt stated that "[w]hen the can pallets are in place, they block [the operator's] view of the area and of personnel that may be present." He further stated that there was (1) no warning alarms signaling that the automatic portion was about to run, (2) no emergency shutdown switch available to the drivers, and (3) no instruction given to Mr. Hall regarding the system or its proper operation. Based on the information available to him and the American Safety for Conveyors and Related Equipment standards, Mr. Prewitt opined that:
 Mr. Hall's fall was the result of his stepping onto the conveyor rollers.
 Requiring workers routinely to walk across a roller conveyor is an unsafe practice.
 The conveyor system was unsafe because of no warning of impending operations was available and no emergency stops were on the conveyor. Furthermore, the Folger's operator's view of the area was obstructed, making it difficult to determine if personnel were in danger around the conveyor.
 The lack of instruction to Mr. Hall may have contributed to his fall because of unfamiliarity of the equipment or its operating characteristics.
Mrs. Hall's testimony corroborated her husband's regarding his injuries and his course of treatment from the date of the accident through the date of trial. At trial, the Halls also introduced an abundance of medical records and bills. Briefly, Mr. Hall's medical treatment during the interval between the November 1994 accident and the July 1996 confirmation hearing can be summarized as follows.
On the date of the accident, Mr. Hall was transported by ambulance from the Folger's warehouse to Pendleton Memorial Methodist Hospital emergency room. In the emergency room, his primary complaints were back and left leg pain. After taking x-rays and finding no fractures or dislocations, the emergency room doctor released him and referred him to an orthopedist, Dr. Alain Cracco After seeing the company doctor, Dr. Donald Berry, on November 17, 1994, Mr. Hall obtained LVL's approval to see Dr. Cracco.
On November 21, 1994, Dr. Cracco first saw Mr. Hall and ordered that he remain on complete bed rest. Although Dr. Cracco ordered an MRI, Mr. Hall was unable to have one due to the presence of metal in his head from a Viet Nam shrapnel injury. Instead, on December 22, 1994, he had a CAT scan at Slidell Memorial Hospital, which showed multi-level disc abnormalities. Given the results of the CAT scan, Dr. Cracco referred Mr. Hall to Dr. Bryant George, a neurosurgeon.
*1241 On January 16, 1995, Dr. George first saw Mr. Hall and prescribed medication and physical therapy. He also ordered a mylegram and CT scan, which were performed at Pendleton Memorial Hospital on February 2, 1995. These tests revealed three level disc herniations. Dr. George thus recommended that Mr. Hall undergo a multi-level discectomy.
On May 1, 1995, Dr. John Schuhmacher, an orthopedic surgeon, saw Mr. Hall for a second opinion regarding the recommended surgery. Dr. Schuhmacher concurred in Dr. George's recommendation that the surgery was necessary given Mr. Hall's multi-level disc disease.
On May 23, 1995, Dr. George, assisted by Dr. Joseph Epps, Jr., performed the surgery. Mr. Hall's improvement following the surgery, according to the Halls' testimony, only lasted two weeks. Thereafter, his pain returned to its pre-operative level. On July 11, 1995, he was treated at Methodist Hospital emergency room for an episode of severe back pain. On July 25, 1995, a CAT scan was done, and on August 14, 1995, another CAT scan and a mylegram were done. Given Mr. Hall's persistent pain, Dr. George referred Mr. Hall to Dr. Christopher Lew, an anesthesiologist with Gulf Coast Pain Institute.
On September 1, 1995, Dr. Lew first saw Mr. Hall. Dr. Lew treated Mr. Hall for post-lumbar laminectomy pain by giving him two caudal epidural injections on September 18, 1995, and October 16, 1995; however, Mr. Hall did not obtain relief from his pain. Dr. Lew recommended a spinal cord stimulator or morphine pump/spinal opioid modes of pain management. Dr. Lew also noted Mr. Hall was depressed and recommended possible psychological care.
On January 30, 1996, Dr. James Butler, an orthopedic surgeon with Tulane Medical School, saw Mr. Hall at the request of the workers' compensation ("WC") carrier. Dr. Butler recommended that Mr. Hall have a surgical fusion of the spine. Although Dr. George concurred in Mr. Hall's choice to have that surgery and although that surgery was scheduled, it was cancelled, apparently due to the WC carrier refusal to pay for it.
In May 1996, Mr. Hall was admitted on two separate occasions to the Crosby Memorial Hospital emergency room for treatment. On May 8th, he was admitted with complaints of a possible heart attack, but diagnosed with an anxiety attack. On May 13th, he was admitted with complaints of excruciating back pain. At trial, Mr. Hall also listed the prescription drugs he has taken and testified he filled his prescriptions at Wal-Mart and Picayune pharmacies. He also testified that the medical devices he has been prescribed included a TENs device, a back brace, a cane, and a walker.

PROCEDURAL BACKGROUND
On October 10, 1995, Mr. and Mrs. Hall filed the instant suit against Folger (the "Hall Suit").[3] Their petition alleged that Mr. Hall was injured on November 15, 1994, when he fell from the conveyor belt system platform at Folger's New Orleans warehouse while delivering coffee cans for his employer. As discussed elsewhere in this opinion, the petition alleges negligence on the part of Folger. Their petition requested that Folger be served through its registered agent for service of process, CT Corporation System ("CT") at its Baton Rouge office. Thereafter, Folger neither *1242 answered nor filed other responsive pleadings.
Armed with the sheriff's return reflecting CT was served on November 1, 1995, the Halls obtained a preliminary default against Folger on January 24, 1996. On June 18, 1996, the trial court conducted a confirmation hearing. On July 15, 1996, the trial court confirmed the default and entered judgment against Folger, awarding Mr. Hall damages totaling $910,572.79, which it itemized as follows:

Past medical expenses $ 70,627.79
Future medical expenses $100,000.00
Past lost wages $ 42,054.00
Future loss of wages $297,891.00
Past and present physical and
mental pain and anguish $400,000.00

The trial court also awarded Mrs. Hall $45,000 in loss of consortium damages.
As noted, Folger responded by filing both an appeal from the default judgment and a nullity action.

POSTURE OF DEFAULT JUDGMENT APPEAL
The procedural events that transpired in the seven-year interval between the Halls' confirmation of the default judgment in July 1996 and the instant decision on Folger's default judgment appeal present a procedural morass that would be a law professor's dream and a law student's nightmare. Summarizing that procedural history, we stated in Hall:
Folgers [sic] initially filed a motion for suspensive appeal and posted the required appeal bond on August 21, 1996. (No. 96-CA-2146). On November 12, 1996, Folger filed in this court a motion to stay the appeal and filed in the district court the instant nullity action (CDC No. 96-18775)(the "Nullity Action"). In the Nullity Action, Folger asserted that it was never served with the citation and petition in the Hall Suit, never waived service, and never made a general appearance. The trial court consolidated the Nullity Action with the Hall Suit.
On January 16, 1997, this court granted Folger's motion and ordered that the default judgment appeal be stayed "until appellant's action of nullity is final."... [W]e subsequently dismissed that default judgment appeal with the caveat that all the issues in that appeal were preserved for the appeal of the nullity judgment.
Meanwhile, on May 1, 1997, TTC filed a Petition of Intervention into the Hall Suit seeking to assert its rights under the Workers' Compensation Law in the Halls' tort recovery. Subsequently, TTC also intervened into Folger's nullity suit. Although the trial court granted Folger's exceptions to TTC's intervention in the nullity action, this court reversed, finding the employer had a right to intervene. Hall v. Folger Coffee Co., XXXX-XXXX c/w XXXX-XXXX (La.App. 4 Cir. 2/7/01), 781 So.2d 620. In so doing, we expressly noted the then pending, yet stayed, default judgment appeal....
On June 9, 1997, the trial court granted Folger's motion for summary judgment, reasoning that although the return was presumed correct, Folger rebutted the presumption by introducing affidavits establishing that CT was not served and that Folger never received the service documents. From that decision, the Halls appealed. Framing the pivotal issue presented as whether service of process was effected on Folger through CT and finding a genuine issue of material fact remained on that pivotal issue, we reversed. Folger [Coffee Co. v. Hall, 97-2472, p. 5 (La.App. 4 Cir. 6/24/98), 715 So.2d 1224, 1226 (Folger I)] ...

*1243 Meanwhile, on July 25, 2001, the Halls filed peremptory exceptions of no cause of action and no right of action in Folger's nullity suit. They argued that Folger was precluded from filing its nullity suit because it made a general appearance on August 21, 1996 when it filed its Motion for Suspensive Appeal seeking review of "all aspects" of the default judgment. On September 17, 2001, TTC likewise filed the same exceptions and asserted the same arguments. On September 28, 2001, the trial court overruled the exceptions.
That ruling was the subject of writ applications to both this court and the Louisiana Supreme Court. On October 10, 2001, this court denied the Hall's writ (2001-C-1899), stating that "[o]n the showing made, the district court has not abused its vast discretion in ... overruling their Exceptions of No Cause of Action and No Right of Action." On October 12, 2001, this court granted in part TTC's writ (2001-C-1901), ordering the district court to provide TTC with the judgment of September 28, 2001, but otherwise denying the writ, stating that "[o]n the showing made, the district court has not abused its vast discretion in ... overruling their Exceptions of No Cause of Action and No Right of Action." On October 17, 2001, the Louisiana Supreme Court denied the Hall's and TTC's request for a stay and writ application. Folger Coffee Co. v. Hall, 2001-2784 (La.10/17/01), 799 So.2d 1140.
Hall, XXXX-XXXX, XXXX-XXXX at pp. 3-4, 843 So.2d at 625-26.
Following the bench trial on remand, which was held on October 17, 2001, the trial court again annulled the default judgment. Finding Folger failed to meet its burden of proving the invalidity of the presumptively valid sheriff's return, we again reversed. Hall, supra. Stressing the "unique, complex procedural history of this case," we determined that it was appropriate to allow Folger an opportunity to brief the issues that were preserved by this court when we dismissed Folger's timely filed default judgment appeal. Hall, 2002-920, 2002-921 at p. 20, 843 So.2d at 635. Although the Halls and TTC again assert in this appeal that such issues are not properly before us, we find the above summary of the procedural history of this case adequately addresses and disposes of that contention. We now review Folger's default judgment appeal.

DEFAULT JUDGMENT PRECEPTS
"A judgment of default must be confirmed by proof of the demand sufficient to establish a prima facie case." La. C.C.P. art. 1702(A). Construing the prima facie case requirement of Article 1702, the Louisiana Supreme Court in Sessions & Fishman v. Liquid Air Corp., 616 So.2d 1254 (La.1993), stated:
In order for a plaintiff to obtain a default judgment, "he must establish the elements of a prima facie case with competent evidence, as fully as though each of the allegations in the petition were denied by the defendant." Thibodeaux v. Burton, 538 So.2d 1001, 1004 (La. 1989); Blue Bonnet Creamery, Inc. v. Simon, 243 La. 683, 146 So.2d 162, 166 (1962). "In other words, the plaintiff must present competent evidence that convinces the court that it is probable that he would prevail on a trial on the merits." Thibodeaux, 538 So.2d at 1004. A plaintiff seeking to confirm a default must prove both the existence and the validity of his claim.
616 So.2d at 1258.
In reviewing a default judgment, an appellate court is restricted to determining whether the record contains sufficient evidence to prove a prima facie case. *1244 Rhodes v. All Star Ford, Inc., 599 So.2d 812, 813 (La.App. 1 Cir.1992). Although there is a presumption that the judgment confirming a default is supported by competent evidence, it does not apply when, as in this case, there is a transcript of the confirmation proceeding. Hickman v. Wm. Wrigley, Jr., Co., 33,896 (La.App. 2 Cir. 10/4/00), 768 So.2d 812. In reviewing a default judgment in such a case, "the reviewing court is able to determine from the record whether the evidence upon which the judgment was based was sufficient and competent." Id.
Confirming a default judgment is akin to a trial at which only the plaintiff is present. 1 Frank L. Maraist & Harry T. Lemmon, Louisiana Civil Law Treatise:Civil Procedure § 12.3 (1999). At such trial, the unopposed plaintiff must comply with a set of special, somewhat strict rules in proving his claim. 19 Frank L. Maraist, Louisiana Civil Law Treatise: Evidence and Proof § 2.9 (1999). The following special rules are pertinent to the present case.
First, the plaintiff is confined to the facts and the theories pled in his petition; he may not expand his pleadings by introducing evidence at the confirmation hearing. Thus, the plaintiff is precluded from obtaining a default judgment "different in kind from that demanded in the petition." La. C.C.P. art. 1703; see Spear v. Tran, 96-1490 (La.App. 4 Cir. 9/18/96), 682 So.2d 267. However, the Louisiana Supreme Court has held that "the pleadings which lead up to the demand, or prayer, upon which a default judgment is based are to be construed no more restrictively than pleadings suggestive of other judgments." Royal Furniture Co. of Baton Rouge, Inc. v. Benton, 260 La. 527, 532, 256 So.2d 614, 616 (1972).
Second, "[b]ecause at a default confirmation there is no objecting party, to prevent reversal on appeal, both plaintiff and the trial judge should be vigilant to assure that the judgment rests on admissible evidence" that establishes a prima facie case. George W. Pugh, Robert Force, Gerald A. Rault, Jr., and Kerry Triche, Handbook on Louisiana Evidence Law 639 (2003 ed.). As a corollary, "[e]xcept as authorized by the Code of Civil Procedure Article 1702, or evidence that fits within one of the exceptions provided by [the Louisiana Evidence] Code, hearsay evidence is inadmissible to confirm a default." Id.; see La. C.E. art. 1101(A)(providing that "[e]xcept as otherwise provided by legislation, the provisions of this Code shall be applicable to the determination of fact ... in proceedings to confirm a default.")
Third, depending on the nature of the plaintiff's demand, Article 1702 sets forth several exceptions to the rule against the use of hearsay evidence at the confirmation hearing. One of those pertinent exceptions is that "[w]hen a demand is based upon a delictual obligation, the testimony of the plaintiff with corroborating evidence, which may be by affidavits and exhibits annexed thereto which contain facts sufficient to establish a prima facie case, shall be admissible, self-authenticating, and sufficient proof of such [delictual] demand." La. C.C.P. art. 1702(B)(2). Another pertinent exception is that "[w]hen the demand is based upon a claim for personal injury, a sworn narrative report of the treating physician or dentist may be offered in lieu of his testimony." La. C.C.P. art. 1702(D); see Smith v. Lewis, 597 So.2d 1267 (La.App. 3 Cir.1992)(construing this provision to mean that a treating physician's affidavit that incorporates an attached narrative report is a "sworn narrative report of the treating physician" sufficient to establish a prima facie case).
Finally, a defendant against whom a default judgment is confirmed may not *1245 assert an affirmative defense on appeal. Having failed to answer or defend the suit, a defendant cannot defeat the default judgment against it by asserting the statutory immunity defense on appeal. Galland v. National Union Fire Ins. Co. of Pittsburg, Pennsylvania, 452 So.2d 397, 398-99 (La. App. 3 Cir.1984); Romero v. Sunseri, 359 So.2d 305, 308 (La.App. 4 Cir.1978).
Applying the latter rule, we readily dispose of Folger's first argument that the trial court erred in failing to find it was Mr. Hall's statutory employer and thus immune from tort liability. Statutory employer immunity is an affirmative defense that a defendant must plead in its answer. Davis v. Kreutzer, 633 So.2d 796, 800 (La.App. 4 Cir.1994). Although Folger acknowledged at oral argument before this court the jurisprudence holding that affirmative defenses, such as statutory employer immunity, must be plead in the answer, it argued this issue was raised by the Halls at the default judgment confirmation hearing. Particularly, Folger relies upon the statement in the affidavit of Jimmy Pearson, Mr. Hall's co-worker, that the truck drivers who made deliveries to Folger's warehouse were required to perform certain tasks involving the coffee cans "in furtherance of the business of Folger." As the Halls and TTC point out, this statement by Mr. Pearson was merely a legal conclusion, which had no binding effect. Given its failure to answer or defend the suit, Folger cannot defeat the default judgment against it by asserting the statutory immunity defense on appeal. Galland, supra.
Folger's second argument is that the trial court erred in confirming the default judgment because the Halls failed to establish a prima facie case of liability or damages as required to confirm the default judgment.

FOLGER'S LIABILITY
A prima facie case is established "when the evidence proves the essential allegations of the petition to the same extent required as if those allegations had been specifically denied." In re Justice of the Peace Landry, XXXX-XXXX, p. 12 (La.6/29/01), 789 So.2d 1271, 1279. Stated otherwise, a "prima facie case" is one that will entitle a party to recover if no evidence to the contrary is offered by the opposing party. Black's Law Dictionary (5th ed.1979).
In confirming the default judgment, the Halls introduced both their own testimony and documentary evidence to establish the allegations of their petition.[4] The petition alleged that the accident occurred as Mr. Hall made his way across the "very unstable conveyor roller device approximately three feet off of the floor." It further alleged that "one of the rollers slipped and sent him crashing to the floor crushing his lower spine, back, causing immediate and excruciating pain as well as permanent low back injury." Still further, the petition alleged that "the design, configuration and setup of this area around the conveyor roller device dictated the methodology of Mr. Hall and other drivers who made deliveries to Folger's plant." And still further, the petition alleged the following enumerated negligent acts of Folger and/or its employees in the "erroneous and faulty and dangerous design and set-up of the configuration of the conveyor-roller device and surrounding area":
*1246  Design of a conveyor system which required a human being to cut straps binding the unfilled cans to the pallets before moving further into the manufacturing chain;
 Requiring that human being to climb or clamber over the conveyor roller device without properly designed or through-out protection or maneuvering assistance, or easily, a pathway clear of obstruction from one side of the conveyor roller device to the other side of said device;
 Requiring that he delivering truck drive[r], and not a Folger employee, or two employees, one of each side, accomplish this erroneous and dangerous task;
 Any and all other acts of negligence which will be proven at the trial of this case.
Citing the above allegations and La. C.C. art. 1703's prohibition against expanding the pleadings at the confirmation hearing, Folger contends that the Halls pled only a negligence theory, not a strict liability theory against Folger as premise owner. As a result, Folger contends that the Halls in their brief improperly rely on a strict liability theory to support the trial court's finding of liability. Folger further contends that the Halls' negligence claim is not supported by competent evidence. The Halls' only evidence of negligence, Folger contends, was Mr. Hall's hearsay statement that Folger "required" him to use the procedure he used to offload his trailer. Folger still further contends that Mr. Hall's own negligent actions caused his accident; particularly, Folger cites Mr. Hall's actions in (1) overloading the conveyor belt with all the pallets thus blocking the use of the kick plate, (2) failing to use the kick plate to safety cross the conveyor belt, and (3) standing directly on the conveyor rollers knowing from his own past experiences and observations that injury could occur. Hence, Folger argues that Mr. Hall was either solely or substantially at fault for his accident.
We find the record establishes that Mr. Hall's accident was the direct result of Folger's employee's actions in operating the conveyor belt and thus governed solely by La. C.C. art. 2315. See Taylor v. Entergy Corp., XXXX-XXXX, p. 12 (La.App. 4 Cir. 4/17/02), 816 So.2d 933, 939-40 (citing Fontenot v. Fontenot, 635 So.2d 219 (La.1994) and finding defendant's acknowledgement that hole was created by its personnel resulted in case being governed solely by La. C.C. art. 2315). As the Louisiana Supreme Court explained in Fontenot, "[w]here plaintiffs prove that a defendant is the actor directly responsible for the creation of an unreasonable risk of harm which causes injury, regardless of the location, that defendant may, depending on the results of a duty-risk analysis, be held liable as the tortfeasor." Fontenot, 635 So.2d at 222, n. 8 (emphasis in original).
The duty-risk analysis Louisiana courts apply in determining whether a defendant is liable for negligence under La. C.C. art. 2315 requires a plaintiff establish four elements by a preponderance of the evidence; namely:
(1) The conduct in question was a cause in fact of the resultant harm;
(2) The defendant owed a duty to plaintiff;
(3) The duty owed was breached; and
(4) The risk or harm caused was within the scope of the breached duty.
Fontenot, 635 So.2d at 223.
Folger's negligent act that was the cause-in-fact of Mr. Hall's injuries was its operator's starting the conveyor belt without finding out if someone was standing on it and without issuing any warning. Stated *1247 another way, the negligence was Folger's operator running the conveyor belt without regard to the safety of the drivers who were in the unloading area delivering the pallets. The Halls' proof of Folger's negligence included Mr. Hall's testimony, especially his answers to the trial judge's specific questions on this issue. In particular, we note the following colloquy between the trial court and Mr. Hall:
THE COURT:
To your knowledge, someone turned the conveyor belt on?
THE WITNESS;
I think so, yes, ma'am.
It had to be the operator on the top, you know, that brought the cans asas she needed them or he needed them, whatever. Anyway, the next thing I knew, I was sitting on the floor.
THE COURT
Did you see the conveyor belt move at all?
THE WITNESS:
Yes, ma'am, because a pallet of cans was starting to move, so it had to move. It was automated, you know.
THE COURT:
When the pallet with the cans on it started to move, what happened to you?
THE WITNESS:
That's what I'm saying, I fell.
Applying the other duty-risk factors, Folger clearly owed a duty to Mr. Hall, as well as anyone else that mounted its conveyor belt structure, not to turn on the conveyor belt without ensuring that no one was standing on it or without warning. This duty stems simply from the traditional tort principle that "one person owes a duty to another if he can `foresee' an unreasonable risk of harm to the other arising from his conduct." Frank L. Maraist and Thomas C. Galligan, Louisiana Tort Law § 3-2 (1996). The Halls established through the testimony of Mr. Hall as well as the affidavits of his co-worker, Mr. Pearson, and their expert, Mr. Prewitt, that Folger breached this duty. Finally, there is an ease of association between the duty not to operate a conveyor belt system without making sure no one is standing on it or without warning and the risk that one who is standing on it when it is unexpectedly started will be thrown down and sustain injuries. See Fontenot, 635 So.2d at 223 (citing Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 622 (1972)).
We thus find the duty-risk analysis establishes that under the facts proven at trial, liability for the injuries and damages sustained by the Halls should be imposed on Folger. Our finding renders it unnecessary to address the other issue Folger raised regarding the Halls' failure to plead a strict liability claim against Folger as premise owner.
COMPARATIVE FAULT
As noted above, Folger alternatively contends that the trial court erred in failing to assess allor substantially allthe fault to Mr. Hall.[5] In addressing this issue, we find insightful our analysis of a similar issue in a similar procedural setting in Jackson v. Tyson, 526 So.2d 398 (La.App. 4 Cir.1988). In Tyson, the defendant-landlord's attorney failed to appear on a scheduled trial date, and the case was tried without the defendant. On appeal from a judgment in favor of the plaintiff-tenant, the defendant asserted the defense of comparative fault. Rejecting that defense, we *1248 reasoned that the plaintiffs' use of the stairs on which she fell was not negligence because it was her only access to her second floor apartment. We further noted that the plaintiff testified when the injury occurred she was walking slowly and being very careful and that there was nothing in the record to suggest otherwise. We still further noted that the trial court obviously believed the plaintiff's testimony.
By analogy, we find that Mr. Hall's stepping onto the conveyor belt to get across to cut the straps on the other side was not negligent. The record establishes there was no other way for him to get across. Folger's counterargument regarding the kick plate is not supported by the record.[6] Rather, the record establishes the kick plate was blocked when the drivers were unloading the pallets. Our finding is buttressed by Mr. Hall's testimony that he had been delivering these pallets to Folger's warehouse for a year and a half and that he was being careful when he was thrown off the conveyor belt. The trial court obviously believed Mr. Hall's testimony, and we cannot say that the trial court was manifestly erroneous.

DAMAGES
Folger also argues that the Halls failed to establish a prima facie case of damages. More particularly, Folger challenges three categories of the trial court's damage award: (1) past medical expenses, (2) future medical expenses, and (3) general damages. We separately address each of these.

PAST MEDICAL EXPENSES
Folger acknowledges in its brief that some of the medical evidence the Halls introduced at trial complied with the special rule set forth in La. C.C.P. art. 1702(D), which permits a plaintiff in a personal injury action to introduce a sworn narrative report of his treating physician in lieu of live testimony. Particularly, it acknowledged that the Halls properly introduced sworn affidavits incorporating and identifying the reports and bills from Dr. Cracco ($318 in bills), Dr. George ($12,559 in bills), and Dr. Lew ($1,747 in bills). The crux of Folger's argument on past medical expenses is its claim that the Halls thus only introduced competent evidence establishing $14,624 (the sum of that trio of doctors medical bills) of the $70,627.79 past medical expense award. This argument, however, confuses the separate inquiries of medical causation and quantum.
A plaintiff is required to establish both the causal connection between his injuries and the accident and the quantum of his damages. To establish the causal connection between the injuries and the accident, the plaintiff must introduce competent evidence establishing that it is more probable than not that the injuries were caused by the trauma suffered in the accident. Each of the trio of doctors attested in their affidavits that Mr. Hall's injuries were consistent with the reported accident's mechanism of injury. At oral argument before this court, Folger's counsel emphasized the doctors' failure to recite that it is more probable than not that Mr. Hall's injuries were caused by the trauma suffered in the accident. However, the Louisiana Supreme Court has held that "it is not necessary for the plaintiff's *1249 medical witness to recite the proper legal jargon verbatim before the trial court can properly rely on his testimony." Housley v. Cerise, 579 So.2d 973, 980 (La.1991). Continuing, the Supreme Court instructed that "[a]ppellate courts should look to the substance of a witness's testimony to determine whether the trial court was manifestly erroneous in finding that it establishes causation by a preponderance of the evidence." Id.
Looking at the substance of the affidavits and attachments from this trio of doctors, we find sufficient evidence establishing the causative link between Mr. Hall's injuries and the accident at Folger's warehouse. We further find additional support for this causative link in the Halls' testimony at trial and in the certified report of Dr. Cornelius Gorman, a vocational rehabilitation specialist who reviewed Mr. Hall's medical records. See La. C.C.P. art. 1702(B)(2)(providing that a plaintiff's testimony along with corroborating evidence may be sufficient to establish a prima facie case of liability on a delictual obligation.)
We further note, as the Halls contend, that the presumption of causation adopted in Housley likewise supports a finding of causation. That presumption applies when the plaintiff establishes that (1) before the accident, he was in good health, (2) commencing with the accident the symptoms of a disability condition appeared, (3) which continuously manifested themselves thereafter, and (4) medical testimony establishes a reasonable possibility of a causal connection between the accident and the disabling condition. Galligan, supra at § 4-4(a). Here, Mr. Hall testified that he was in good health before the accident. Although he indicated that he had heart surgery in 1990, he further indicated that eight months after that surgery he was fully recovered and returned to work. He still further indicated that he worked steadily from that time until the date of the accident at Folger's plant. He testified that on the date of the accident he was in good health and that since the date of the accident he has been unable to work. Moreover, Mr. Hall's treating physician, Dr. George, opined that he is permanently disabled from work. Mr. Hall's symptoms appeared immediately after the accident and continued through the date of trial. Finally, as noted above, the medical evidence presented by the trio of doctors established a causal connection between the accident and his injuries. Thus, all four Housley presumption requirements are satisfied in this case.
In sum, the competent evidence introduced at trial supports the trial court's finding that the Halls established a prima facie case of damage causation. We now turn to the separate inquiry of the quantum of past medical expenses.
Some of the medical records and bills the Halls introduced were neither properly certified nor accompanied by a treating physician's sworn narrative report. Those medical records and bills thus were not admissible to prove that the medical services were necessary or that the expenses incurred were reasonable. Nonetheless, the jurisprudence has recognized that such medical records and bills are admissible to support the plaintiff's testimony as to the fact that the plaintiff incurred these medical expenses and the costs incurred. See Campbell v. Kendrick, 556 So.2d 140, 142 (La.App. 5 Cir.1990). This view is consistent with the principle that "[w]hen a plaintiff claims to have incurred medical expenses and those claims are supported by a bill, the proof is sufficient, unless there is contradictory evidence or reasonable suspicion that the bill is unrelated to the accident." Smith v. Clement, 2001-87, p. 7 (La.App. 3 Cir. *1250 10/3/01), 797 So.2d 151, 157. Although Folger contends that the failure of the Halls to separately identify at trial each of Mr. Hall's medical bills by amount distinguishes this case from the jurisprudence, we find that a distinction without a difference. In his testimony, Mr. Hall recounted in detail all his medical treatment from the date of the accident through the date of the trial. We thus find the Halls' introduction of those medical records and bills for such services at the end of the Halls' testimony sufficiently established the differential amount between the certified and sworn bills of the trio of doctors (Drs. Cracco, George, and Lew) and the total past medical expense award. We thus find no error in the trial court's award of past medical expenses.

FUTURE MEDICAL EXPENSES
Folger also challenges the award of $100,000 in future medical expenses. Future medical expenses, like other damages, must be established with some degree of certainty. The proper standard for determining whether a plaintiff is entitled to an award of future medical expenses is "proof by a preponderance of the evidence that the future medical expenses will be medically necessary." Hoskin v. Plaquemines Parish Government, 97-0061, pp. 4-6 (La.App. 4 Cir. 12/1/97), 703 So.2d 207, 210-11. Addressing the issue of future medical expenses, the Louisiana Supreme Court has stated:
When the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required.
Stiles v. K Mart Corp., 597 So.2d 1012, 1013 (La.1992).
Recovery of future medical expenses thus requires proof, by a preponderance of the evidence, that such expenses will be medically necessary. Lacy v. ABC Ins. Co., 97-1182, p. 13 (La.App. 4 Cir. 4/1/98), 712 So.2d 189, 196. When the record sufficiently establishes the need for future medical care, but not the exact cost of such care, "the factfinder may make a reasonable award." Lacy, 97-1182 at p. 13, 712 So.2d at 196. Such is the case here.
Contrary to Folger's contention, the record reflects Mr. Hall's need for future medical expenses. Folger's argument to the contrary overlooks the fact that Mr. Hall was scheduled for a second surgery, and it was cancelled only because of his WC carrier's refusal to pay for it. The medical evidence set forth in the properly introduced records of Drs. George and Lew establishes Mr. Hall's need for a second surgery, a spinal cord stimulator, or both. Specifically, Dr. Lew's reports indicate that even assuming Mr. Hall undergoes the second surgery he may still require a spinal cord stimulator to alleviate his pain. Dr. Lew also recommended future psychological care.
Considering Mr. Hall's $70,627.79 in past medical bills, including physical therapy and medication, which we found supported by the record, we cannot say that the $100,000 future medical expenses award was not reasonable.

GENERAL DAMAGES AWARD
Folger's final contention is that the $400,000 general damage award was excessive. When the trier of fact (in this case, the trial judge) has made a general *1251 damage award and the defendant is contending that award is excessive, the "abuse of discretion" standard of appellate review applies. This standard is both hard to particulate and necessarily "non-specific." Cone v. National Emergency Services, Inc., 99-0934, p. 8 (La.10/29/99), 747 So.2d 1085, 1089 (citing Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993)).
In reviewing such an award, an appellate court's initial inquiry is whether the particular effects of the particular injuries on the particular plaintiff are such that there has been an abuse of the "much discretion" vested in the trier of fact (here the judge). Youn, 623 So.2d at 1260. The rationale behind the application of the "much discretion" standard in review of general damage quantum awards is that "awards of general damages, at least as to the amount awarded for injuries proved to have been caused by the tort, cannot be calculated with mathematical certainty." Guillory v. Insurance Co. of North America, 96-1084, p. 1 (La.4/8/97), 692 So.2d 1029, 1036 (Lemmon, J., concurring)(citing Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968)). For that reason, general damage awards are reviewed under the "much discretion" standard of La. Civ.Code art. 1999, which provides: "[w]hen damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages." La. C.C. art. 1999; see also La.C.C. art. 2324.1 (providing "[i]n the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury"). The jurisprudential theme that has emerged is that "the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Youn, 623 So.2d at 1261.
Applying that standard to the facts of this case, we cannot find the trial court abused its vast discretion in awarding $400,000 to Mr. Hall. At the time of trial, Mr. Hall was forty-seven years old and was receiving WC benefits. He was still under the care of his treating physician, Dr. George. As noted, Dr. George's opinion was that Mr. Hall was permanently disabled from work.
We find instructive on the issue of general damages the following extensive listing Mr. Hall's present symptoms set forth in Dr. Gorman's report:
1. Low back pain, constant.
2. Left leg failure.
3. Burning sensation in toes, back of left calf.
4. Headaches.
5. "Nerve" problems.
6. Minor trouble with right leg.
7. Sleep disruption due to pain.
8. Weather intolerance and stiffness.
9. Muscle cramping and spasms to left lower extremity.
10. Tension in neck and shoulders.
11. Ill-tempered.
12. Depression (does not feel like taking care of himself, shaving, etc.)
13. Weight gain.
We further find instructive the Halls' testimony regarding the general effects Mr. Halls' injuries have had on their life and their marriage. We also note Mr. Hall's testimony that he was forced to get rid of his hunting dogs because he was no longer able to take care of them. Lastly, we note that Mr. Hall has undergone one back surgery and is in need of a second one.
Given these particular circumstances and these particular injuries, we cannot find the trial court abused its much discretion in awarding $400,000 in general damages to this particular plaintiff.

*1252 DECREE
For the reasons assigned, we affirm the judgment of the trial court confirming the default judgment against Folger Coffee Company.
AFFIRMED.
NOTES
[1] Although LVL was his actual employer, he was paid by T.T.C. Illinois ("TTC"). TTC intervened in both the Halls' personal injury suit and their nullity action, seeking to recover the workers' compensation payments it has paid. TTC is a party to the instant appeals.
[2] At oral argument before this court, Folger's counsel suggested that Mr. Hall stepped onto a moving conveyor belt. This suggestion is not supported by the record. Rather, Mr. Hall testified that in order to cut the straps he would first stop the conveyor belt. Moreover, the record reflects that what caused him to fall was the sudden, unexpected movement of the conveyor belt.
[3] The petition also named as a defendant the ficticiously named "XYZ Insurance Company" as Folger's liability insurer; however, no actual insurer was ever substituted for XYZ as a defendant.
[4] The only other witness called at the hearing was an employee from the City of New Orleans who identified various official documents establishing that Folger was the owner of the warehouse located at 14601 Old Gentilly Road and that it had obtained a building permit to operate as a coffee manufacturer at that location.
[5] Although we recognize that comparative fault, like statutory employer immunity, is an affirmative defense that may not be raised on a default judgment appeal, we nonetheless address this issue because Folger argues that Mr. Hall was solely at fault.
[6] Although Folger argues that the kick plate was only blocked when the entire load of pallets was unloaded at once and that it was Mr. Hall's hurried approach that precluded him from being able to access the kick plate, this is only argument. We decline to speculate regarding how many pallets could be offloaded without blocking the use of the kick plate.