|!ARMSTRONG, Judge.
This is a personal injury case. The eleven month old baby of defendants Robert B. and Catherine S. Worley jabbed plaintiff Paulette Tokar Whiteman in the right eye with a ballpoint pen. Ms. Whiteman suffered a corneal abrasion which healed satisfactorily. However, soon thereafter, Ms. Whiteman developed an infection in her eye, which eventually was diagnosed as the sexually-transmitted disease chlamydia. Ms. Whiteman suffered for several months from the chlamydia eye infection and was left with some visual impairment to her right eye which can be remedied (perhaps not entirely) only by a corneal transplant.
Ms. Whiteman sued the Worleys for Civil Code Article 2318 strict liability, as the parents of the baby who had injured Ms. White-man, and their insurer, Aetna Insurance Company. After trial, a jury found liability and fixed damages at $160,000. The Worleys and their insurer appealed.
The parties agree that the Worleys are strictly liable under Civil Code Article 2318 for any injury-causing act of their baby which would have constituted negligence if the baby had been of rational age. Also, there appears to be no contest that the jabbing would have constituted negligence if the baby had been of ^rational age. Thus, we express no opinion as to those aspects of the strict liability determination.
However, the Worleys and their insurer raise a number of issues on appeal including causation (cause-in-faet as to the chlamydia infection), contributory negligence, quantum of damages, and evidentiary and jury instruction issues. We find that Ms. Whiteman failed to prove that the jab in the eye with the ballpoint pen was the cause-in-fact of her chlamydia infection, that the jury was not clearly wrong or manifestly erroneous in determining that Ms. Whiteman was not con-tributorily negligent, and that the other issues raised on appeal are rendered moot by our decision as to causation. We award Ms. Whiteman damages of $25,000 for the jab in her eye and the corneal abrasion (but not the chlamydia infection) but otherwise reverse the judgment of the trial court.
Ms. Whiteman and Ms. Worley were teachers at Trinity Episcopal School. On January 13, 1992, Ms. Worley was in the school’s faculty lounge, with her eleven month old baby, putting report cards into cubby holes for home room teachers. Ms. Whiteman observed that Ms. Worley’s baby was crawling about on a table and, fearing that the baby might fall, volunteered to hold onto her. Ms. Whiteman held the baby *209 around the tummy. While she was doing this, the baby began playing with Ms. Wor-ley’s purse. Suddenly, without any warning, the baby jabbed a ballpoint pen, apparently taken from the purse, into Ms. Whiteman’s right eye.
Ms. Whiteman was taken to the emergency room. Ms. Whiteman’s contact lens was tom in half. She was examined and given some treatment at the emergency room but was told to see an ophthalmologist right away.
|3Ms. Whiteman was seen by Dr. Dabezies, an ophthalmologist, the same day, January 13, 1992. He determined that she had suffered an abrasion to her comea. He treated Ms. Whiteman with a topical anaesthetic, an antibiotic and a bandage. The anaesthetic was given due to pain from exposed nerve endings resulting from the abrasion. The antibiotic was given due to a general risk of infection. Dr. Dabezies testified that there was an increased possibility of infection generally (not chlamydia) due simply to “germs in the atmosphere”.
Dr. Dabezies saw Ms. Whiteman for follow-up visits on January. 14, 15, 16 and 20, 1992 and continued to treat her with antibiotics. On January 20, 1992, her eye “seemed to be fairly clear and that’s the time I [Dr. Dabezies] first discharged her”. As of January 20,1992 her corneal abrasion had healed.
However, three days later, on January 23, 1992, Ms. Whiteman returned to Dr. Dabez-ies with an eye infection. He was surprised to see signs of infection at that point. He could not tell the source of the infection. He saw Ms. Whiteman again on January 24 and 27, 1992 and continued to treat her with an antibiotic as well as an ointment (apparently, a steroid) for swelling. However, her eye seemed to be the same or worse and she complained of pain during this period. The last time he saw Ms. Whiteman was January 27, 1992, as he was informed she was seeing another doctor, and he never conclusively established the cause of her eye infection.
Dr. Dabezies’ testimony was that Ms. Whiteman’s symptoms of eye infection, beginning on January 23, 1992, were “consistent” with a chlamydia infection although he had never diagnosed a chlamydia infection. He also testified that the most common way to get a chlamydia eye infection is to touch one’s genitals and then one’s eye. Dr. Da-bezies testified that he never determined that |4the infection was caused by a germ that she picked up when she had the corneal abrasion. He testified, in response to a hypothetical question from Ms. Whiteman’s counsel, that he “guessed” that it was “possible” that Ms. Whiteman had chlamydia germs in her eye at the time she suffered the corneal abrasion, she was treated by him with steroids that masked the symptoms of a chlamydia infection, and that the symptoms manifested later. However, Dr. Dabezies did not testify that the corneal abrasion made it any more likely that she would get a chlamydial infection of the eye nor did he testify that the jab with the ballpoint pen transmitted the chlamydia germs to her eye.
Ms. Whiteman went to see another ophthalmologist, Dr. Scott Lanoux, for a second opinion as to her eye infection. He was “suspicious” that “something” other than the jab with the ballpoint pen was “going on”. He had some concern that it could be a chlamydial infection and, because he did not have the equipment to do a culture for chlamydia, he referred her to Dr. Delmar Caldwell.
Dr. Caldwell is an ophthalmologist with a corneal subspecialty. He first saw Ms. Whiteman on February 5, 1992. Her right eye was infected and her left eye was clear. He performed cultures for both chlamydia and herpes. Later, the herpes culture was negative and the chlamydia culture was positive. But, on the February 5,1992 first visit, even before having the culture results, he started Ms. Whiteman on topical tetracy-clines which are a treatment for chlamydia. On her second visit, on February 10,1992, he started Ms. Whiteman on oral tetracyclines in addition to the topical tetracyclines. He saw Ms. Whiteman for a number of follow up visits. During this period she began to have an infection problem with her left eye. On March 11, 1992 Ms. Whiteman was much better and her eyes were mostly cleared up.
| gHowever, on March 25, 1992, Ms. White-man returned to Dr. Caldwell with a severe flareup or recurrence of the chlamydial infec *210 tion. Dr. Caldwell repeated the chlamydial culture and it later proved to be positive as to her left eye and negative for her right eye. Dr. Caldwell testified that, as of April 1, 1992, they were effectively starting the chla-mydial treatment over again. By April 29, 1992, the chlamydial infection was finally cleared up and Dr. Caldwell discontinued Ms. Whiteman’s medications on May 20, 1992.
Dr. Caldwell testified that chlamydia is a sexually-transmitted disease. That is, it is almost always transmitted from one person to another by sexual contact although there are rare exceptions when it is transmitted by some other means. He testified that, most likely, Ms. Whiteman got the chlamydia germs into her eye by her own hand. That is the usual source of chlamydia eye infections although other methods are possible. He specifically testified that the chances of the jab with the ballpoint pen getting the chlamydial germs into her eye were “very close to zero”. He also testified that, as Ms. Whiteman was asymptomatic at the time of the jab with the ballpoint pen, it was improbable that she had chlamydia germs in her eye at that time. Perhaps most importantly, he testified that the corneal abrasion would make Ms. Whiteman’s eye only “slightly” more sensitive (Le.susceptible) to a chlamydial infection. As to the March 25,1992 flareup of the infection, he testified that it must have been caused by either her failing to take her antibiotic medication or by her having sexual contact with a person with chlamydia. At no time did Dr. Caldwell testify that there was a significant possibility, much less any probability, that the jab in the eye with the ballpoint pen caused or contributed to the chlamydial eye infection either by transmitting the germs to the eye or by making the eye more susceptible to chlamydial infection.
UDr. David Martin was called as an expert witness by the defense. He never examined Ms. Whiteman but had reviewed her medical records. Dr. Martin is a specialist in infectious diseases and has special expertise with respect to chlamydia. For example, he has published at least fifty articles of which most relate to chlamydia.
Dr. Martin testified that, almost 100% of the time, chlamydia is transmitted from one person to another by sexual contact. Although there are instances in which it is transmitted by some other means, these are extremely rare. The primary source of chla-mydial eye infections is the touching of the genitals followed by touching the eye. In particular, Dr. Martin testified that it was very, very unlikely (less than a 1% chance) that the jab in the eye with the ballpoint pen transmitted the chlamydia germs to Ms. Whiteman’s eye.
He also testified that chlamydia is a “silent” disease and that (presumably in the absence of an eye infection) most people have no symptoms. In fact, he testified, only 10% of women have any symptoms. He explained that untreated chlamydia infections can last “a couple of years” and be completely unknown. Thus, Ms. Whiteman could have had chlamydia, as a genital infection, for quite a long time before she developed the eye infection. This is of some significance because Ms. Whiteman’s medical histories, as given to her doctors, reflected denials of recent sexual activity.
Most importantly, Dr. Martin explained why it was unlikely that Ms. Whiteman’s corneal abrasion would have increased the chances of her getting a chlamydia infection in her eye. The chlamydial organism causes an “intracellular” infection. That is, the chlamydia organism, although not a virus, fives inside the infected cell like a virus and unlike staph and most other infections. Apparently,_j7this means that the chlamydia germs must be in some sort of bodily fluid, such as the genital tract or the eye, and limits the means of transmission. Dr. Martin testified that, while a corneal abrasion might increase the chances of a staph or some other infection, it would be very unlikely to increase the chances of a chlamydial infection. This is consistent -with the testimony of Dr. Caldwell that the corneal abrasion would have only a very slight effect on the chances of a chlamydial eye infection and the testimony of Dr. Dabezies that a corneal abrasion would increase the chances of infection generally (not chlamydia) from “germs in the air”.
*211 Ms. Whiteman bears the burden of proving it was “more probable than not” her chlamydia infection was caused by the jab in her eye with the ballpoint pen. E.g., Housley v. Cerise, 579 So.2d 973, 980 (La.1991). In reviewing issues of fact, including the issue of whether the jab in the eye with the pen caused or contributed to the chlamydial eye infection, we apply the clearly wrong/manifest error standard of appellate review. Stobart v. State, DOTD, 617 So.2d 880 (1993); Rosell v. ESCO, 549 So.2d 840 (1989). We must review the record as a whole, not merely the evidence supporting Ms. Whiteman’s position, as to this factual issue. Id.
Taking the medical testimony as a whole, it is clear that it does not establish that, more likely than not, the jab in the eye with the ballpoint pen caused the chlamydia eye infection. Not a single one of the doctors so testified.[1] To the contrary, Dr. Caldwell and Dr. Martin stated that there was almost no chance at all that the ballpoint pen jab transmitted the chlamydia germs to Ms. Whiteman’s Reye. Also, Dr. Caldwell testified that the corneal abrasion would have only “very slightly” increased the chances of a chlamydia eye infection and Dr. Martin testified as to why a corneal abrasion would not be likely at all to increase the chances of a chlamydial eye infection. Dr. Dabezies testified only as to a corneal abrasion increasing the chances of infection generally and did not testify as to whether a corneal abrasion could increase the likelihood of a chlamydia eye infection. Thus, the medical testimony does not establish any cause-in-fact relationship between the jab in the eye with the ballpoint pen and the chlamydia eye infection.
However, Ms. Whiteman argues that she is aided by a legal presumption that, because she had no symptoms of a chlamydia eye infection before the jab in the eye with the ballpoint pen, and because she had such symptoms after the jab, the jab is presumed to have caused the chlamydia eye infection.
The rule of legal presumption upon which Ms. Whiteman relies is set out in Housley v. Cerise, 579 So.2d 973 (La.1991):
A claimant’s disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.
579 So.2d at 980 (quoting Lucas v. Insurance Company of North America, 342 So.2d 591 (La.1977)).
As we read it, the Housley presumption rests on two requirements which must both be met for the presumption to be applicable. First, the symptoms must 19commence “with” the accident.[2] In Housley itself the symptoms began “[immediately after the accident”, 579 So.2d at 980, and there was a diagnosis “[sjeveral hours later”. Id. In the present case, in contrast, the first symptoms of an eye infection (chlamydia, as it turned out) did not commence until ten days after the accident and three days after the corneal abrasion had healed. Thus, the present case has much less of the “close temporal relationship”, 579 So.2d at 981, between accident and symptoms than was present in Housley and is suggested by the reference “commencing with the accident”. 579 So.2d at 980.
The second requirement for the application of the Housley presumption is that “the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the [symptoms]”. 579 So.2d at 980 (emphasis added). We have reviewed the medical testimony in great detail above and have concluded that it does not by itself establish that, more probably than not, the jab in the eye with the ballpoint pen caused the chlamydia eye infection. But, for purposes of the Housley presumption analysis, it is not necessary that the medical evidence by *212 itself establish the probability of causation, but, instead, it is necessary only that the medical evidence by itself establish a “reasonable possibility” of causation. Id. The “close temporal relationship” provides the balance of the proof of causation “more probably than not”.
The doctors who testified did not, of course, use the phrase “reasonable possibility” to address causation. But, we must look to the substance of their testimony as to causation. Id. We must equate if not translate, between medical terminology and a legal standard. We have done so to the best of our ability, andliogiving due deference to the finder of fact, and have concluded that the medical evidence does not show a “reasonable possibility” of a causal connection between the accident and the disabling condition. The medical testimony was uniform that there is virtually no possibility that the jab with the ballpoint pen introduced the chlamydia germs into the eye and that there is only a “slight” chance or less that the corneal abrasion made Ms. Whiteman more susceptible to a chlamydia eye infection.
Thus, the present case presents a fairly distant “temporal relationship” between accident and symptoms and medical testimony that does not seem to establish a “reasonable possibility5’ of causation. Consequently, even under the Housley analysis, Ms. Whiteman has failed to prove that the jab in her eye with the ballpoint pen caused her chlamydia eye infection.
The Worleys and their insurer argue that Ms. Whiteman was contributorily negligent in causing the jab in her eye with the ballpoint pen. They also argue that, in the context of Civil Code Article 2318 strict liability, such contributory negligence acts as a complete bar to recovery by Ms. Whiteman.
The gist of the defense argument is that Ms. Whiteman did not take care to prevent the ballpoint pen from jabbing her eye. There was contradictory testimony about the exact sequence of events leading up to the jab in the eye. Ms. Whiteman testified that she never saw that the baby had the ballpoint pen before the jab. She did realize that the baby was playing in a purse that was on the table but we cannot see how that would forewarn Ms. Whiteman that she might be endangered in any way. In sum, the essence of Ms. Whiteman’s testimony was that the jabbing was sudden and unexpected and that there was neither warning nor opportunity to take any precaution. The jury, as the principal determiner of credibility, could credit luthis testimony in the absence of any evidence that renders it untenable. Stobart, supra; Rosell, supra. Thus, we cannot find that the jury was clearly wrong or manifestly erroneous in finding no contributory negligence on the part of Ms. Whiteman.
Lastly, there is no contest that the pen jab in the eye did inflict a painful injury, a corneal abrasion, that required medical attention. However, the corneal abrasion did heal in one week and Ms. Whiteman had a good recovery from that injury. She had lost wages of about $1,264.28 and medical expenses of $2,211.95, but only a small portion of those special damages were the result of the corneal abrasion as opposed to the later chlamydial infection. We believe that an award of $25,000 for the corneal abrasion is ample.
For the foregoing reasons, we reverse the judgment of the trial court and render judgment in favor of the plaintiff and against the defendants for $25,000.

REVERSED AND RENDERED.

JONES, J., concurs in part and dissents in part.
LANDRIEU, J., dissents.

. We look to the substance of the doctors' testimony and not to whether they recited the proper legal jargon as to causation. Housley, supra.

. The symptoms must also "continuously manifest themselves afterwards” although that does not appear to be an issue in the present case.