# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 04-988

MICHELLE DETRAZ

VERSUS

VICTOR LEE D/B/A VIRGIN NAILS

**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20026019
HONORABLE HERMAN C. CLAUSE, DISTRICT JUDGE

**********
**ULYSSES GENE THIBODEAUX
CHIEF JUDGE**
**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, Michael G. Sullivan, Billy Howard Ezell, and James T. Genovese, Judges.

**SULLIVAN, J., DISSENTS FOR THE REASONS ASSIGNED BY JUDGE GENOVESE.**

**GENOVESE, J., DISSENTS AND ASSIGNS WRITTEN REASONS.**

**REVERSED AND RENDERED.**

Philip Stephen Aucoin, Jr.
Stacy S. Lee
400 East Kaliste Saloom Road - Suite 1400
Lafayette, LA 70508
Telephone: (337) 291-1743
COUNSEL FOR:
      Defendants/Appellees - Bechin Huynh and Bechin Huynh, d/b/a
      Virgin Nails

Chris Paul Villemarette
Scott M. Hawkins
Hawkins, Garbin & Villemarette, LLC
102 Asthma Boulevard - Saloom III
Suite 110
Lafayette, LA 70508
Telephone: (337) 233-8005
COUNSEL FOR:
      Plaintiff/Appellant - Michelle Detraz

THIBODEAUX, Chief Judge.

In this negligence action, Melissa Detraz appeals a judgment entered pursuant to a jury verdict denying her petition for damages for scars resulting from an infection contracted during a pedicure at Virgin Nails, a nail salon. She argues the jury incorrectly concluded that, despite Virgin Nails' inadequate sterilization procedures, their negligence did not cause an infection in her legs. Because Ms. Detraz has proven causation, we reverse the judgment and assign damages of $79,380.00 for the cost of future surgeries and $50,000.00 in general damages.

I.

**ISSUES**

Ms. Detraz argues the jury erred when it concluded that, although Virgin Nails negligently failed to sanitize its pedicure equipment, their negligence did not cause the staph infection Ms. Detraz contracted that left disfiguring scars on her legs. Ms. Detraz urges that the jury failed to weigh properly the testimony of Dr. Darrell Henderson regarding the causal link between the unsanitary pedicure and her staph infection.

Ms. Detraz also appeals the trial court's refusal to honor the jury's request to review certain testimony after deliberations began. Additionally, she asserts that the presence of an alternate juror in the deliberation room after the jury retired corrupted the deliberation process, making a new trial necessary. Finally, Ms. Detraz also filed a motion to make an audiotape of certain testimony part of the record. Because we conclude the jury erred with respect to causation and reverse their verdict, we do not address these issues.

1

## II.

## <u>FACTS</u>

Melissa Detraz received a pedicure at Virgin Nails on September 23, 2002.[1] That morning, she shaved her legs as usual but recalled scratching the back of her right leg. Before she sat down in the pedicure chair vacated by the previous client, Ms. Detraz observed the nail technician spray the whirlpool tub attached to the chair and wipe it clean, a process that took about ten or fifteen seconds. As part of the pedicure, Ms. Detraz immersed her bare legs into a tub of water approximately halfway up her calf. The technician then trimmed and shaped her nails and cuticles. The technician applied new nail polish and massaged Ms. Detraz's legs. The pedicure took about forty-five minutes. Ms. Detraz testified she felt no pain or injury to her toes during the pedicure. Within two days of receiving the pedicure, she noticed a red, tender bump on the back of her right leg in an area that corresponded to the place where she had cut herself while shaving the day of the pedicure. The red bump quickly multiplied, turning into oozing sores which did not resolve, despite her efforts to care for them and clean them herself.

Ms. Detraz went to the Medical Center of Southwest Louisiana emergency room on October 22, 2002. The triage nurse asked her numerous questions, such as whether she went hiking, whether she had ever had a pedicure, and whether she tanned. The nurse, however, noted in Ms. Detraz's chart only that "Unaware if from tanning bed or fungus." Ms. Detraz testified that, although she admitted to the ER nurse she had used tanning beds in the past, she did not tell the nurse she thought she had contracted the infection from a tanning bed. In fact,

---

[1]Although Virgin Nails makes much of Ms. Detraz's inconsistent deposition testimony regarding the date of the pedicure, by the time of trial the date was clearly established. Ms. Detraz refreshed her recollection of the date of the pedicure based on a check payable from her account to Virgin Nails, bearing her signature and endorsed by Bechin Huynh. The check is dated September 23, 2002.

according to her testimony, she had not used a tanning bed in five to six months before her pedicure. The ER told Ms. Detraz she had contracted a fungus, but prescribed Nystatin, which is a yeast medication.

Despite the medication, there was no improvement and the infection continued to spread. On November 1, 2002, Ms. Detraz visited Dr. Ronald Daigle, a dermatologist. Although he attempted to culture the infection, no bacteria grew from the sample and he was unable to clinically confirm his diagnosis. He prescribed Bactrim and Omincef which are used to treat staph infections. Ms. Detraz responded to the antibiotics and her symptoms began to resolve. However, the sores had caused serious scarring on her legs. Ms. Detraz next went to Dr. Adrian Stewart. Dr. Stewart could not identify the derivation of her infection, but discouraged surgery for the scars.

Finally, Ms. Detraz sought treatment from Dr. Darrell Henderson, a plastic surgeon, on April 16, 2003. Dr. Henderson took a complete medical history concerning the pedicure. He informed Ms. Detraz that her scars were permanent and would require several surgeries to correct. Ms. Detraz sued Virgin Nails for damages, arguing that its failure to properly clean the pedicure equipment caused her staph infection and subsequent scarring. During trial, Ms. Detraz presented the jury with evidence that Virgin Nails did not follow appropriate procedures for sanitizing its equipment before each pedicure. After a trial on the merits, a jury concluded that Virgin Nails had been negligent in its administration of its pedicure procedures, but its negligence had not caused Ms. Detraz's injuries. Ms. Detraz appeals.

III.

## LAW AND DISCUSSION

The Louisiana Supreme Court delineated the standard for assessing liability for damages caused by a party's negligence in its decision in *Fowler v. Roberts*, 556 So.2d 1 (La.1989). In that opinion, the court stated:

> The determination of liability in a negligence case usually requires proof of five separate elements: (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element).

*Id.* at 4.

Thus, to determine liability for negligence, a party must undertake this duty/risk analysis. In this case, the salient issue is whether Virgin Nails' negligent breach of its duty to customers to control the risk of infection caused Ms. Detraz's infection and subsequent scarring.

Ms. Detraz demonstrated that Virgin Nails did not follow proper sanitization procedures when cleaning its equipment, specifically the pedicure tub in which Ms. Detraz immersed her feet and lower legs during the pedicure. Virgin Nails used Barbicide, a disinfectant, to clean the whirlpool tubs attached to the pedicure chairs. The directions on the Barbicide bottle require the user to prepare a solution of two ounces of Barbicide to thirty-two ounces of water and thoroughly wet all surfaces with the mixture. The instructions require that the surface remain wet for ten minutes, and then be allowed to air dry. Alternatively, the user may soak the item in the Barbicide solution. Actually soaking the tub in solution is not practical, because

the tub is attached to the pedicure chair, so the operators must drench the surfaces of the tub with the Barbicide solution for ten minutes, and then permit the wet surface to dry in order for it to be effective.

Bechin Huynh and Bon Huynh, the operators of Virgin Nails, provided inconsistent testimony about the procedures they followed to clean the pedicure tubs. For example, Ms. Huynh testified that she sprays the tub with Barbicide, then again with clean water, and wipes it down with a clean towel. She testified that she leaves the Barbicide solution on the tub surface for ten minutes. During her deposition, however, she stated that she only sprayed and wiped the surface of the tub, without allowing the solution to sit on the surface for ten minutes. She also testified she did not "soak" the surface of the tub.

The directions also require permitting the wet surface to air dry after being thoroughly wet for ten minutes. While Ms. Huynh claimed that she does permit the tub surface to air dry, she also testified that the surface was sprayed with clean water and then wiped dry after only five or ten minutes.

Mr. Huynh further explained that, to clean the tub between customers, the technician sprays Barbicide on the tub just before the end of each customer's pedicure, when her feet are removed and the water drained from the tub. The technician then massages the customer's legs and paints her toenails, which takes between ten and fifteen minutes. She then finishes cleaning the tub by rinsing the tub with clean water and wiping it with a clean towel. Mr. Huynh also admitted that he prepares a stronger Barbicide solution than necessary, assuming that a stronger solution would be more effective.

Kathy Arceneaux, a licensed cosmetologist for twenty years, was admitted as an expert in cosmetology. She read from a standard cosmetology

textbook, used to educate cosmetology students regarding guidelines for use of disinfectants. The text admonished that "disinfectants must always be used in strict accordance with manufacturer's instructions" and noted specifically that "mixing chemicals stronger than recommended by the manufacturer counteracts their effectiveness" and might be dangerous at higher concentrations. The text continued: "Such variables as mixing precautions and exposure times demand particular attention." Ms. Arceneaux testified that, in her expert opinion, mixing the chemical stronger than manufacturer recommendations was ill-advised, and failure to follow the manufacturer's instructions could render the product ineffective. Thus, the salon operators' testimony demonstrates that they did not strictly adhere to the Barbicide instructions as to solution strength, exposure time, and drying procedure. The jury's finding of negligence in a case where the defendant's responsibility was to provide a clean environment for nail care customers can only be construed to mean they found Virgin Nails' *sanitization* procedures inadequate.

The Jury Verdict Form asked the jury whether Virgin Nails was *negligent* in performing the pedicure. The jury answered in the affirmative. Answering this question in the affirmative, however, enfolds all five of the *Fowler* factors, including causation. The next Verdict Form question, however, asked the jury whether this negligence caused Ms. Detraz's injuries. The jury answered in the negative. Given their response to the first question on negligence, the jury's response on causation is counterintuitive. Because the Jury Verdict Form is awkwardly worded using the comprehensive word *negligence*, the crucial question is causation.

Ms. Detraz asserts the *Housley* presumption as the basis of her proof of causation. The *Housley* presumption derives from the Louisiana Supreme Court case *Housley v. Cerise*, 579 So.2d 973 (La.1991), in which the court determined:

6

> A claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.

*Id.* at 980 (quoting *Lucas v. Ins. Co. of N. Am.*, 342 So.2d 591 (La.1977)).

Thus, a plaintiff is entitled to a presumption of causation if she establishes the elements of *Housley.* In *Juneau v. Strawmyer*, 94-903 (La.App. 4 Cir. 12/15/94), 647 So.2d 1294, 1299, the fourth circuit described the three requirements for the application of *Housley*:

> First, he must prove he was in good health prior to the accident at issue. Second, he must show that subsequent to the accident, symptoms of the alleged injury appeared and continuously manifested themselves afterwards. And third, he must demonstrate through evidence – medical, circumstantial, or common knowledge – a reasonable possibility of causation between the accident and the claimed injury.

*Id.* at 1299.

Virgin Nails claims that Ms. Detraz did not show she was healthy before the pedicure; however, it does not offer any medical records that show otherwise. There is no evidence that Ms. Detraz suffered any dermatological infections prior to the event. None of the three doctors testified that Ms. Detraz had divulged any prior medical condition, such as allergies, skin infections, or injuries to her legs. In fact, Dr. Henderson testified that, besides the scars, her skin was free of imperfections. Additionally, Ms. Huynh testified that she would not have permitted someone with symptoms like those of Ms. Detraz to receive a pedicure at Virgin Nails. Therefore, Ms. Detraz did not have these symptoms on or before September 23, 2002, the date of the pedicure. Finally, Ms. Detraz and her mother testified that this condition

7

developed after the pedicure, and not before. Defendants suggest that Ms. Detraz's testimony and that of her mother is self-serving and, therefore, insufficient to show that she did not suffer from any medical conditions before the staph infection. Courts have rejected self-serving testimony in cases where the testimony is uncorroborated, or other evidence contradicts the substance of the testimony. *Dubriel v. Horseshoe Entertainment*, 34,885 (La.App. 2 Cir. 8/22/01), 793 So.2d 459. In this case, however, Ms. Detraz's testimony is both corroborated and uncontradicted. Therefore, Ms. Detraz has satisfied the first requirement of *Housley*.

The second element of Housley requires that the symptoms of the alleged injury appear subsequent to the accident and continuously manifest themselves afterwards. In *Whiteman v. Worley*, 96-305 (La.App. 4 Cir. 2/19/97), 688 So.2d 207, *writ denied*, 97-966 (La. 5/30/97), 694 So.2d 246, the fourth circuit declined to find causation based on *Housley*. The court reasoned that the plaintiff's eye infection did not manifest until ten days after she was hit in the eye with a pen and that there was "much less of the 'close temporal relationship' . . . between accident and symptoms." *Whiteman*, 688 So.2d at 211. In contrast, in *Lindsey v. USAA Property & Casualty Insurance Co.*, 02-797, p. 8 (La.App. 4 Cir. 10/9/02), 830 So.2d 335, 339, the court credited a car accident victim's statement that "the injury was objectively apparent to him immediately after the accident." The victim testified he felt a sharp and persistent pain in his neck and back the day after the accident. The pain had not resolved by the time of trial. The defendant in *Poland v. State Farm Mutual Automobile Insurance Co.*, 03-1417 (La.App. 1 Cir. 6/25/03), 885 So.2d 1144, argued that the plaintiff could not use *Housley* to establish causation since she waited 137 days after the accident before she sought treatment. The court disagreed, observing that the plaintiff and three witnesses testified that her symptoms manifested within

8

days of the accident. Plaintiff's testimony that she had symptom-free days was not inconsistent with "continuous manifestation" of the injury, particularly because her symptoms never completely resolved. Finally, the court concluded that her "failure to seek medical treatment for several months does not preclude the possibility that she was, in fact, injured, and in pain." *Id.* at 1150-51. In contrast, in *Morris v. Allstate Insurance Co.*, 25,148 (La.App. 2 Cir. 2/23/94), 632 So.2d 1209, *writ denied*, 94-1044 (La. 6/17/94), 638 So.2d 1099, the court found that the victim of a car accident did not continuously manifest symptoms because, when she did visit her doctor, she did not complain of pain or symptoms. Furthermore, later medical reports did not show she told her doctors she had experienced intermittent back pain since the accident. *Id.*

Virgin Nails argues that the infection lacks a close temporal relationship to the pedicure because Ms. Detraz waited a month to seek medical treatment. In *Poland*, 885 So.2d 1144, however, the first circuit held that a several month delay in seeking treatment did not undermine the *Housley* presumption. Here, as in *Poland*, 885 So.2d 1144, Ms. Detraz's symptoms manifested within two to three days of the pedicure. Additionally, she testified she did not obtain treatment because she was attempting to treat the infection herself with over-the-counter medication. When she did seek medical attention, she went to several doctors with the same complaint. *Morris*, 632 So.2d 1209. Ms. Detraz never had symptom-free days. Her symptoms manifested within two to three days of the pedicure, and lasted continuously as an active infection until late November 2002, after which they became scars.

The final prong of *Housley* requires Ms. Detraz show there was a reasonable *possibility*, not probability, Virgin Nails' negligent sanitization procedures caused the staph infection. Ms. Detraz may rely on various evidence, including

9

medical and lay testimony, as well as circumstantial evidence, to establish causation. *Juneau*, 647 So.2d 1294. A precise medical diagnosis is not necessary for plaintiff to carry this burden. The medical evidence must show that "the nature of the accident, when combined with other facts of the case, raises a natural inference through human experience that such a causal connection exists." *Lubom v. L. J. Earnest, Inc.*, 579 So.2d 1174, 1179 (La.App. 2 Cir. 5/8/91). In *Hall v. Folger Coffee Co.*, 02-920 (La.App. 4 Cir. 10/1/03), 857 So.2d 1234, all three doctors who testified concluded that the plaintiff's injuries were consistent with his description of the accident. Defendant "emphasized the doctors' failure to recite that it is more probable than not that [plaintiff]'s injuries were caused by the trauma suffered in the accident." *Id*. at 1248. The court quoted *Housley*'s holding that "it is not necessary for the plaintiff's medical witness to recite the proper legal jargon *verbatim* before the trial court can properly rely on his testimony." *Id*. at 1248-49 (quoting *Housley*, 579 So.2d at 980). The *Hall* decision concluded that the doctors' affidavits, in conjunction with the plaintiff's testimony, were sufficient evidence to establish causation via *Housley*.

In contrast, *Gage v. Potts*, 94-1542 (La.App. 1 Cir. 4/7/95), 653 So.2d 1183, declined to find causation based on *Housley*. The plaintiff, a pregnant woman, argued that an accident caused her to go into labor two months afterwards and suffer serious complications. The medical experts all agreed on an alternate cause of the injury: the plaintiff had suffered from an infection known to trigger early labor. Additionally, they all agreed that it was not reasonably possible for an accident to cause labor two months later. Similarly, in *Whiteman v. Worley*, 688 So.2d 207, the medical evidence showed it was highly unlikely the plaintiff contracted a Chlamydia infection in her eye from a pen that bumped into her eye. The medical testimony

10

strongly held that Chlamydia is transmitted through sexual contact, and any other mode of transfer would be extraordinarily unusual.

In *Arceneaux v. Howard*, 633 So.2d 207 (La.App. 1 Cir. 1993), *writ denied*, 93-3128 (La. 2/11/94), 634 So.2d 833, the third circuit sustained the *Housley* presumption of causation despite medical testimony that the court itself admitted was not ideally certain. Plaintiff suffered injuries in a car accident and was taken to the emergency room. His car was totaled and the impact was strong enough to break his seat belt. Plaintiff evidently hit his head during the crash, but did not display symptoms of injury to the front of his head. Ten days after the accident, the plaintiff began to suffer seizures. The court held:

> In this case, none of the neurologists could state with *any degree of certainty* that he considered the accident to be a contributing factor in causing the seizures. However, all three *based their opinion on an assessment of the seriousness of the accident as related by plaintiff.* All three doctors agreed that head injuries can cause subsequent onset of seizures, but were of the impression that plaintiff's accident was relatively minor and not the type which triggered seizures.
>
> . . . .
>
> The medical records from the accident are sufficient to establish a reasonable possibility that plaintiff's seizures were caused by the accident. The first seizure occurred only ten days after the impact and followed a continuous period of disorientation . . . , which began with the accident. A ten-day delay prior to the onset of the first seizure does not mean the seizure was not caused by the accident. . . . Although plaintiff presented no medical evidence to show that the type of impact to his head generally was a type of injury which would cause seizures, we do not find this fatal to his prima facie case. We believe plaintiff has met the minimal standard of a 'reasonable possibility,' such that a prima facie case was established and he should have been given the benefit of the legal presumption stated in *Housley*.

*Id.* at 210-11 (emphasis added).

The court drew on a wide variety of evidence, including medical evidence from the neurologists and the emergency room report, practical evidence, such as accident reports describing the nature of the collision, and the plaintiff's own history of the injury and subsequent seizures, to conclude that the plaintiff had proven causation under the *Housely* presumption. Even though none of the physicians was willing to state that the collision caused the seizures, the court found that the evidence in aggregate was sufficient to conclude there was a reasonable possibility the accident had caused the plaintiff's seizures.

Ms. Detraz presented medical testimony from Dr. Darrell Henderson, a licensed plastic surgeon. Defendants initially had attempted to exclude Dr. Henderson's testimony before trial. This motion, however, was denied and Dr. Henderson was accepted as an expert, without any limits on issues on which he could render his expert opinion. Defendants did not appeal the denial of their motion. Therefore, Dr. Henderson is properly qualified to render an expert opinion on causation. He testified that, based on the history provided to him by Ms. Detraz, the unsanitized pedicure tub was the cause of the infection. He constructed a timeline, beginning with Ms. Detraz shaving the morning of the pedicure. The shave created many nicks and cuts. When she immersed her legs in the unsanitary bath, the water introduced bacteria into these tiny wounds, resulting in her infection. She began manifesting symptoms within two to three days of exposure, which Dr. Henderson believed represented the incubation period for the bacteria in her system. Dr. Henderson felt it was significant that the only areas affected by the infection were the areas that were both shaved and exposed to the water, which explained why her feet did not suffer any infection. He also testified that, in his practice, he had experience treating patients who had contracted infections from pedicures.

12

Dr. Stewart and Dr. Daigle, in contrast, were unwilling to testify as to causation. They both agreed that it was possible that a customer could contract an infection from an improperly sanitized tub. However, because staph bacteria is ubiquitous in the environment, a staph infection could be caused by many different things. While they were unwilling to adopt Dr. Henderson's position, they would not reject it. Dr. Daigle, for instance, admitted that it was possible to draw a temporal relationship between Ms. Detraz's exposure to the bacteria and her later symptoms, particularly in light of the fact that her legs were freshly shaved.

Dr. Henderson's position was buttressed by other corroborating expert testimony. Kathy Arceneaux, a licensed cosmetologist, was accepted as an expert in cosmetology. She has been a cosmetologist for twenty years and has received specialized training in pedicures and manicures. Ms. Arceneaux testified that, in her expert opinion, improperly cleaning pedicure tubs can generate bacteria that could be dangerous to clients. Additionally, Ms. Detraz introduced an article in Archives of Dermatology, a medical journal, describing the infectious potential of improperly cleaned manicure and pedicure equipment, including specific discussion of bacteria discovered on improperly sanitized whirlpool tubs, such as the ones used by Virgin Nails. She also introduced an article from Nail Pro Magazine, a nail salon trade magazine, describing safe methods for disinfecting manicure and pedicure equipment, including proper use of disinfectants.

After the *Housley* presumption has been established, "the defendant has the burden of producing evidence to persuade the trial court that it is more probable than not that the injury did not result from the accident." *Morris*, 632 So.2d at 1211. For example, in *Seit v. Scofield*, 01-1295 (La.App. 5 Cir. 2/26/02), 812 So.2d 764, the court determined that there were plausible explanations for the victim's back pain

other than an altercation that she alleged resulted in her injuries. The victim had been in a car accident prior to the fight. Also, she weighed over 200 pounds. The court cited these as alternative causes of her injury, preventing application of *Housley*. Virgin Nails did not provide satisfactory evidence of an intervening cause that would destroy the causal link between the pedicure and the infection. They assert that Ms. Detraz contracted the infection from a tanning bed. They attempt to explain this assertion by referring to the note taken by the nurse in the ER regarding possible use of a tanning bed as the source of the infection. Ms. Detraz testified at trial, however, that the nurse had questioned her on multiple activities, including tanning, and she answered honestly. She also testified that it had been months since she had last visited a tanning salon; the tanning salon could not be responsible for the infection, since the symptoms manifested months after her last visit. *Gage*, 653 So.2d 1183. Furthermore, although Dr. Stewart testified she had had some experience with patients who contracted skin infections while at a tanning parlor, Dr. Henderson described precisely how difficult, although clearly not impossible, it would be to contract such an infection. He testified that in order for an infection to occur, there would have to be precise and prolonged contact between an infected spot on the tanning bed and an open wound on the body of the person tanning. He also noted that a dry tanning bed could not compare to the more bacteria-friendly environment found in a damp whirlpool tub. Given the impossible timeline and the greater ease with which one might contract an infection from a whirlpool rather than a tanning bed, defendants' alternative cause is not acceptable.

In *Cooper v. United Southern Assurance Co.*, 97-250, p. 24 (La.App. 1 Cir. 9/9/98), 718 So.2d 1029, 1041, the first circuit stated: "The issue of whether plaintiff is entitled to the benefit of [the *Housley*] presumption is factual and is

subject to the manifest error standard of review. If the jury's findings are reasonable in light of the record viewed in its entirety, the court of appeal may not reverse. Consequently, when there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong." *See also Dixon v. Traveler's Ins. Co.*, 02-1364 (La.App. 4 Cir. 4/2/03), 842 So.2d 478.

However, the Louisiana Supreme Court has held that an appellate court is not required to affirm the trier of fact's refusal to accept the uncontroverted testimony of a witness as true. *Mart v. Hill*, 505 So.2d 1120 (La.1987). In *Mart*, the trial court committed error when it failed to award plaintiff damages because it determined the accident did not cause plaintiff's injury. Later cases employing *Mart* have clarified its application: "Although trial court findings are accorded great deference, appellate courts have a duty to ascertain whether those findings are justified by the record. If an appellate court concludes that the trial court's factual findings are clearly wrong, the mere fact that some evidence in the record supports the finding does not require the court to affirm." *Leale v. Dubois*, 99-957, pp. 2-3 (La.App. 3 Cir. 4/5/00), 756 So.2d 684, 688 (citation omitted). The third circuit further explained in *Butler v. Zapata Haynie Corp.*, 92-71 (La.App. 3 Cir. 2/23/94), 633 So.2d 1274, 1279, *writ granted in part and amended on other grounds*, 94-1171 (La. 7/5/94), 639 So.2d 1186, *cert. denied*, 513 U.S. 1017, 115 S.Ct. 579 (1994):

> In other words, an intermediate appellate court is not required to follow blindly the factual determinations of a trial court without discerning whether that court's discretion in evaluating facts and credibility has been abused. Certainly, the fact finder should be accorded great latitude and discretion, but discretion must always be buttressed by sound judgment.

*Id.* at 1279.

The jury in this case was manifestly erroneous in concluding a lack of

causation. The equivocal testimony of Dr. Stewart and Dr. Daigle does not detract from the strength of Dr. Henderson's testimony. Their unwillingness to adopt Dr. Henderson's perspective is not sufficient to controvert his testimony.

## *Damages*

Dr. Henderson characterized Ms. Detraz's scars as "markedly disfiguring." A markedly disfiguring scar is one that can be seen easily across a room. There are twenty-two scars of varying size and depth, some as deep as two to three millimeters. Dr. Henderson testified there was a dramatic change of coloration between the scars and the surrounding skin. He also noted that, otherwise, Ms. Detraz's skin was perfect in texture, color, and consistency. Because the scars are depressed, Ms. Detraz cannot effectively cover them with cosmetics. Therefore, surgery is the most appropriate solution to resolve her scars.

The shape and number of scars will necessitate complicated and extended surgeries. After surgery, she will need a leg brace extending from the thigh to the knee to immobilize her leg, and she will have to give up sports or running. Therefore, one leg will have to be treated at a time, otherwise Ms. Detraz would be entirely unable to walk. She will require approximately six surgeries over the course of several years to treat all of her scars. The surgery will not eliminate the scars entirely, but merely replace the round scars with linear scars. Furthermore, if elective surgery is not undertaken now, she may need surgery on an emergency basis as she ages if the scar tissue begins to deteriorate.

Ms. Detraz testified that the scars have impacted her self-confidence. She no longer wears skirts or shorts, and does not visit pools or beaches. Her employer, Pascale's Spa, requires her to wear slacks and she is not allowed to go near the customers. Furthermore, while she had an active infection, she was afraid to

touch her child for fear of passing the infection on to him.

Dr. Henderson estimated the total cost of all the surgeries would be $79,380.00. We award Ms. Detraz all of her past and future medical expenses. Ms. Detraz also requested $187,000.00 in general damages, a figure which represents $8,500.00 per scar, with twenty-two scars. In reaching this sum, she relies on *Moore v. Healthcare Elmwood, Inc.*, 582 So.2d 871 (La.App. 5 Cir. 6/5/91) in which the fifth circuit upheld an award of $8,500.00 for two, five-inch linear scars. Ms. Detraz points out that Dr. Henderson testified that surgical revision of circular scars is more difficult than of linear scars. Additionally, he described the scars as "markedly disfiguring." Ms. Detraz also recounted the effect the scars have had on her life, and the difficulties she will undergo as a result of the series of surgeries. In rendering an initial award of general damages, an appellate court is "not limited to an award of either the lower or highest amount we would affirm. Instead, we set the award in an amount which is just compensation for the damages revealed by the record." *Butcher v. City of Monroe*, 31,932, p. 10 (La.App. 2 Cir. 5/5/99), 737 So.2d 189, 196, *writ denied*, 99-1608 (La. 9/17/99), 747 So.2d 566; *Savelle v. Heilbrunn*, 552 So.2d 52 (La.App. 3 Cir. 1989), *writ denied*, 556 So. 2d 1267 (La.1990). In *De Los Reyes v. USAA Casualty Insurance Co.*, 28,491 (La.App. 2 Cir. 6/26/96), 677 So.2d 668, the second circuit reviewed a general damages award of $35,000.00 for a teenage girl who had suffered five scars, ranging from three centimeters to twenty centimeters in length, in addition to other injuries. She had been forced to give up a modeling job because of the scars. The court noted that "[g]eneral damages involve mental or physical pain and suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which can not be definitively measured in monetary terms." *Id.* at 672. Similarly, in *McBride v. State Farm*

*Mutual Auto Insurance Co.*, 01-954 (La.App. 5 Cir. 3/26/02), 815 So.2d 249, *writs denied*, 92-1484 (La. 9/24/02), 825 So.2d 1182; 02-1639 (La. 9/24/02), 825 So.2d 1183, the fifth circuit upheld a damages award of $75,000.00 to a victim in a car accident who, in addition to serious internal injuries, suffered disfigurement and permanent scars on his face. Finally, in *Neason v. Transit Management of Southeast Louisiana, Inc.*, 00-1271, p. 6 (La.App. 4 Cir. 4/18/01), 789 So.2d 31, 35, the fourth circuit awarded an eight year old child $20,000.00 in general damages for "permanent prominent facial scars" caused in an accident.

Although Ms. Detraz bears serious cosmetic effects from the infection she contracted at Virgin Nails, she has suffered no lasting medical effects from the infection. We feel general damages award of $50,000.00 is reasonable and adequate.

IV.

**CONCLUSION**

For the above reasons, the trial court's verdict is reversed. We award $50,000.00 in general damages and $79,380.00 for the cost of future surgeries. Costs of appeal are assessed to appellee Virgin Nails.

**REVERSED AND RENDERED**.

MICHELLE DETRAZ

VERSUS

VICTOR LEE d/b/a/ VIRGIN NAILS

**GENOVESE, J., dissenting**.

I find no manifest error in the jury verdict and must respectfully disagree with the majority as to the issue of causation.

The jury's findings in this case are reasonable in light of the review of the record in its entirety. Though there are two permissible views of the evidence, the jury's choice between them cannot be considered manifestly erroneous or clearly wrong, nor is this court allowed to simply substitute its view for that of the jury. Though the jury found negligence in this case, it did not find legal causation, nor did Dr. Stewart or Dr. Daigle, the only two dermatologists who testified at trial. The majority in this case reverses a jury verdict based on the testimony of a plastic surgeon who never saw, nor treated Plaintiff's infection, who is not a dermatologist, and who did not even examine the Plaintiff until approximately seven months post infection. I respectfully dissent and would affirm the jury verdict.