CHIEL KIMBLE      *      NO. 2021-CA-0389

VERSUS      *

     COURT OF APPEAL

CURAHEALTH NEW      *
ORLEANS LLC      FOURTH CIRCUIT

     *

     STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2018-11275, DIVISION "A"
Honorable Ellen M Hazeur, Judge
* * * * * *
**Judge Terri F. Love**
* * * * * *
(Court composed of Chief Judge James F. McKay III, Judge Terri F. Love, Judge Tiffany Gautier Chase)


Louis L. Gertler
Helen H. Babin
GERTLER LAW FIRM
935 Gravier Street, Suite 1900
New Orleans, LA 70112

     COUNSEL FOR PLAINTIFF/APPELLEE, CHIEL KIMBLE

Matthew C. Juneau
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC
201 St. Charles Avenue, Suite 3600
New Orleans, LA 70170

     COUNSEL FOR DEFENDANT/APPELLANT, CURAHEALTH NEW ORLEANS, LLC


**AFFIRMED**

**DECEMBER 1, 2021**

*TFL*

*JFM*

*TGC*

This appeal arises from the alleged medical malpractice committed by defendant upon plaintiff while in defendant's long-term care facility. Plaintiff filed suit for damages resulting from decubitus ulcers, but defendant failed to answer or make an appearance. The trial court granted a preliminary default against defendant. Following a hearing wherein plaintiff presented his case, the trial court confirmed the default judgment, awarding plaintiff $1,145,891.81.

Defendant filed a motion for new trial contending that the default judgment was erroneously confirmed because it was not served with the order resetting the hearing and because plaintiff failed to present a prima facie case. The trial court found that defendant should have been served with the order resetting the confirmation default judgment hearing and granted the motion for new trial. On supervisory review, this Court reversed, finding that service was not required, and ordered the trial court to consider the sufficiency of the evidence claims raised in the motion for new trial. The Louisiana Supreme Court denied writs.

On remand, the trial court considered the sufficiency of the evidence and denied defendant's motion for new trial. Defendant appealed asserting that 1) plaintiff's medical records were not certified, 2) plaintiff failed to present a prima

1

facie case, 3) the medical expert did not satisfy the locality standard, 4) the trial court erred by awarding $200,000.00 for future medical expenses, and 5) again, that the default confirmation was void due to lack of service.

On review, we find that the law of the case doctrine governed the lack of service issue. Similarly, the issue of certified medical records was precluded because the issue was not raised before the trial court. The trial court did not err by finding that the medical expert established the standard of care. Further, the trial court's finding that plaintiff established a prima facie case was not manifestly erroneous. The award for future medical expenses was reasonable. The judgment of the trial court is affirmed.

### *FACTUAL BACKGROUND AND PROCEDURAL HISTORY*

On October 28, 2017, Chiel Kimble was injured in a fall and was admitted to East Jefferson General Hospital ("EJGH"). Mr. Kimble was rendered quadriplegic because of the fall. As previously recounted by this Court:

> Mr. Kimble was transferred to Curahealth's [Curahealth New Orleans, LLC] long-term care facility on November 17, 2017, and soon thereafter developed several severe decubitus ulcers and skin breakdown. Curahealth's records reflect that despite physician's orders that Mr. Kimble be turned every two hours to prevent pressure wounds, it failed to implement this customary wound care even after a sacral decubitus ulcer had been discovered and confirmed. The wound grew worse as the result of improper care.
> Mr. Kimble was readmitted to East Jefferson General Hospital on December 9, 2017. Doctors discovered that he now suffered with a sacral IV decubitus ulcer that containing necrotic tissue was deemed "Unstageable." Physicians also discovered that Mr. Kimble's left and right heels presented decubitus ulcers labeled "Deep Tissue Injury." Due to the onset of infection from the sacral ulcer as well as a urinary infection, Mr. Kimble developed C. Dificile Colitis, caused or triggered by the specific antibiotic therapy he needed to fight the sacral wound infection. The

antibiotic, in turn, caused diarrhea and/or a triggering of C. Difficile infection, with colitis and chronic diarrhea, which became a source of infection at the sacral decubitus ulcer site.

On March 9, 2018, doctors performed a colostomy procedure in an attempt to keep the sacral wound site free of diarrhea and allow the wound a chance to heal. Mr. Kimble's wound treatment has since required multiple admissions to East Jefferson General Hospital for both wound and colostomy care.

*Kimble v. Curahealth New Orleans, LLC*, 20-0286, pp. 1-2 (La. App. 4 Cir. 7/8/20), 302 So. 3d 579, 580-81, *writ denied*, 20-00981 (La. 11/4/20), 303 So. 3d 651.

On November 8, 2018, Mr. Kimble filed a Petition for Damages against Curahealth. The Petition was served on Curahealth on January 7, 2019. Curahealth did not file an answer or make an appearance. Mr. Kimble filed a Motion and Order for Preliminary Default, which the trial court granted on February 27, 2019. Following a hearing on December 9, 2019, the trial court, finding that Mr. Kimble presented a prima facie case, confirmed the default judgment against Curahealth and awarded damages as follows:

| | |
|---|---|
| Past, present, future physical pain and suffering | $450,000.00 |
| Past, present, future mental pain and suffering | $250,000.00 |
| Past and present Medicaid medical lien | $245,891.81 |
| Future medicals | $200,000.00 |
| Total | $1,145,891.81 |

The trial court also awarded $3,513.00 for litigation costs.

On January 2, 2020, Curahealth filed a Motion for New Trial contending that the judgment was defective due to lack of service of the order resetting the hearing, no prima facie case was presented, the expert did not establish the local standard of care, and that the award for future medicals was not proven. Mr. Kimble filed a Motion to Strike the Motion for New Trial as impermissible.

3

Following a hearing, the trial court denied Mr. Kimble's Motion to Strike, but granted Curahealth's Motion for New Trial, finding that Mr. Kimble was required to serve Curahealth with the Motion to Reset the Motion to Confirm Preliminary Default. The trial court vacated the judgment confirming the default.

Mr. Kimble sought supervisory review with this Court of the judgment granting Curahealth's Motion for New Trial. This Court found that "the trial court abused its discretion in granting the motion for new trial on the basis that the plaintiff was obligated to have the motion to reset the default confirmation hearing served on Curahealth." *Kimble*, 20-0286, p. 11, 302 So. 3d at 586. Further, we vacated the trial court judgment and remanded "for a determination regarding Curahealth's sufficiency of the evidence claims." *Id*. The Louisiana Supreme Court denied writs. *Kimble v. CuraHealth New Orleans, LLC*, 20-00981 (La. 11/4/20), 303 So. 3d 651.

After considering Curahealth's Motion for New Trial on sufficiency of the evidence grounds on remand, the trial court denied the Motion for New Trial. Curahealth's present suspensive appeal followed.

Curahealth asserts that the trial court erred because 1) the medical records were uncertified, 2) Mr. Kimble did not establish a prima facie case, 3) the medical expert did not meet the locality standard, 4) $200,000.00 for future medical expenses was not proven, and 5) Mr. Kimble was required to serve the Motion to Reset the Motion to Confirm Default.

## STANDARD OF REVIEW

"Appellate courts review confirmation of default judgments under the manifest error/clearly wrong standard of review." *Ernest N. Morial New Orleans Exhibition Hall Auth. v. New Limits New Limits, LLC*, 16-0706, p. 3 (La. App. 4

4

Cir. 4/5/17), 215 So. 3d 974, 975.

## *SERVICE*

We first address Curahealth's assertion regarding the lack of service because, if meritorious, the remaining assignments of error would be pretermitted. Curahealth contends, "despite that Curahealth was placed in preliminary default and had not appeared in the case, plaintiff was required under Louisiana Code of Civil Procedure article 1312 et seq. to serve Curahealth with the Order resetting the default confirmation hearing to December 9, 2019." This Court previously denied Curahealth's application for supervisory review on this exact issue and held that service was not required. *See Kimble*, 20-0286, p. 1, 302 So. 3d at 579.

"The law of the case refers to a policy by which the court will not reconsider prior rulings in the same case." *KeyClick Outsourcing, Inc. v. Ochsner Health Plan, Inc.*, 11-0598, p. 7 (La. App. 4 Cir. 3/14/12), 89 So. 3d 1207, 1211. "[W]e have held that the law of the case doctrine applies to all prior decisions of an appellate court, including decisions rendered on supervisory writ applications, and not just to decisions on prior appeals." *Tsatsoulis v. City of New Orleans*, 99-2544, p. 2 (La. App. 4 Cir. 8/30/00), 769 So. 2d 137, 138. However, "if we merely deny a writ application, without considering the substance of the issue raised, simply because we do not believe that the situation is appropriate for our exercise of our supervisory jurisdiction, then there is no 'decision' as to that issue to be given effect as the law of the case." *Id*. "We do have discretion not to apply the law of the case doctrine in cases in which there was palpable error in the prior decision and in cases in which manifest injustice would result." *Id*., 99-2544, p. 2, 769 So. 2d at 139.

This Court issued a well-considered opinion, finding that Mr. Kimble was

5

not required to serve Curahealth with the order resetting the hearing date for confirmation of the default judgment. We find no palpable error or resulting manifest injustice in this matter. As such, we apply the law of the case doctrine and find that Curahealth's assertions regarding lack of service are without merit.

## DEFAULT JUDGMENT

"If a defendant in the principal or incidental demand fails to answer or file other pleadings within the time prescribed by law or by the court, a preliminary default may be entered against him." La. C.C.P. art. 1701(A). Once a preliminary default is obtained, the default may be confirmed "after two days, exclusive of holidays, from the entry of the preliminary default." La. C.C.P. art. 1702(A).

"Confirmation of a default judgment is similar to a trial." *Arias v. Stolthaven New Orleans, L.L.C.*, 08-1111, p. 7 (La. 5/5/09), 9 So. 3d 815, 820. "In reviewing a default judgment, an appellate court is restricted to determining whether the record contains sufficient evidence to prove a prima facie case." *Mooring Fin. Corp. 401(K) Profit Sharing Plan v. Mitchell*, 08-1250, p. 4 (La. App. 4 Cir. 6/10/09), 15 So. 3d 311, 315. *See also* La. C.C.P. art. 1702. "A prima facie case is established as required for confirmation of a default judgment, when the plaintiff proves the essential allegations of the petition, with competent evidence, to the same extent as if the allegations had been specifically denied." *Id*. A prima facie case entitles a plaintiff to recovery "if no evidence to the contrary is offered by the opposing party." *Id*. Meaning, "the plaintiff must present competent evidence that convinces the court that it is probable that he would prevail on a trial on the merits." *Id*.

### Medical Records

Curahealth contends that the trial court erred by confirming the default

6

judgment because the Curahealth medical records were not certified.

When presenting a prima facie case for confirmation of a default judgment, the plaintiff must submit admissible evidence. *Arias*, 08-1111, p. 7, 9 So. 3d at 820. At the hearing to confirm a default judgment, "the rules of evidence generally apply." *Id.* The Louisiana Supreme Court espoused:

> The plaintiff must follow the rules of evidence even though there is no opponent. "Because at a default confirmation there is no objecting party, to prevent reversal on appeal, both plaintiff and the trial judge should be vigilant to assure that the judgment rests on admissible evidence" that establishes a prima facie case. George W. Pugh, Robert Force, Gerald A. Rault, Jr., & Kerry Triche, *Handbook on Louisiana Evidence Law* 677 (2007). Thus, inadmissible evidence, except as specifically provided by law, may not support a default judgment even though it was not objected to because the defendant was not present. 19 Frank L. Maraist, *Civil Law Treatise: Evidence and Proof* § 1.1, at 5 (2d ed.2007).

*Id.*, 08-1111, p. 8, 9 So. 3d at 820.

Irrespective of whether the Curahealth medical records are certified or uncertified,[1] "[t]he well-settled jurisprudence of this court establishes that as a general matter, appellate courts will not consider issues raised for the first time, which are not pleaded in the court below and which the district court has not addressed." *Council of City of New Orleans v. Washington*, 09-1067, p. 3 (La. 5/29/09), 9 So. 3d 854, 856. See Rule 1-3, Uniform Rules – Courts of Appeal.

After the trial court confirmed the default judgment against Curahealth, Curahealth filed a Motion for New Trial and an Answer containing affirmative

---

[1] The Curahealth medical records begin with the MRO/MROcorp transmittal sheet with the indication that "[y]our requested medical records are attached." The second page is the request Mr. Kimble sent to Curahealth for "**A CERTIFIED COPY** of any and all **medical records** and **bills** which you have pertaining to **CHIEL KIMBLE as of October 2017-present**."

defenses. Both pleadings were filed prior to the hearing on Curahealth's Motion for New Trial. However, neither of those pleadings contained the assertion that the Curahealth medical records were uncertified. Accordingly, we will not address Curahealth's contention regarding its own medical records.

### *Confirmation of Default Judgment*

For the sake of cogency, we combine two of Curahealth's assignments of error: whether Mr. Kimble's medical expert established the appropriate standard of care and whether Mr. Kimble presented a prima facie case.

"Under La. R.S. 9:2794, a plaintiff in a medical malpractice case is required to prove, by a preponderance of the evidence, the following three elements: (i) the standard of care applicable to the defendant; (ii) the defendant's breach of the standard of care; and (iii) the existence of a causal connection between the breach and the resulting injury." *Jordan v. Cmty. Care Hosp.*, 19-0039, p. 11 (La. App. 4 Cir. 7/24/19), 276 So. 3d 564, 575. The "local standard" requires the plaintiff to show "[t]he degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances." La. R.S. 9:2794(A)(1). *See also Piazza v. Behrman Chiropractic Clinic, Inc.*, 601 So. 2d 1378, 1379-80 (La. 1992).

At the hearing to confirm the default judgment, the following evidence was adduced and testimony elicited. Mr. Kimble's testimony was presented via an affidavit, as he was hospitalized at the time. He stated that he "did not have any open wounds or ulcers on [his] body" when he was transferred from EJGH to Curahealth's facility. He was newly quadriplegic and could not turn his body by himself, but could feel pain. He stated that while at Curahealth, he was made to lie

in his own excrement and that his mother and sisters would "clean [him] up." He recalled the development of the sacral ulcer as follows:

> 6. Within days of being admitted I started to feel pain in the buttocks area. I complained about it. I was told that I was supposed to be repositioned very [sic] two hours, so I didn't just lie on my back all the time. But I wasn't. The staff moved me a few times, but it was mostly my mother and sisters who turned me in the bed. I was alone at night and don't remember ever being turned during that time.

> 7. Within days I developed a bedsore on my buttocks. I could feel it. Curahealth did not send a wound care nurse to care for it. It continued to worsen. At times I would lay in my own excrement for hours. I understand this caused the sore to get worse and develop into a decubitus ulcer. It also caused the wound to become infected.

> 8. Days went by and I wasn't being turned regularly except by my family. At times, the pain from the wound on my buttocks was a 10 out of a 10. Finally, toward the end of my stay, a wound care nurse came by, but all she did was change the dressing on it. My mattress was not changed as I understand it should have been. The wound was not debrided or treated in any way.

> 9. I also developed decubitus ulcers on both of my feet. They were painful as well. I received no care from the wound care nurse for the ulcers on my feet.

> 10. I really thought I was going to die in that facility. I was losing a lot of weight, and I had developed an infection from the wound on my buttocks.

Mr. Kimble then explained that he left Curahealth against medical advice and was admitted to EJGH, wherein the EJGH doctors informed him that his sacral decubitus ulcer was worse than a Stage IV. He stated that Curahealth had labeled the ulcer a Stage II. Because of repeated infections in the decubitus ulcer, Mr. Kimble was forced to get a colostomy and his physical and occupational therapy was "limited."

Mr. Kimble's mother testified that she would visit her son at Curahealth from between around seven in the morning and remained until eight or nine

o'clock at night every day. When describing pictures of Mr. Kimble at Curahealth, which were admitted into evidence, Ms. Kimble explained the photo thusly:

> We're changing him because he was laying in feces and his backside had broken down. And I had told the lady, one of the workers there, could they call the wound care nurse. And she came out and she looked at the wound. She said, "[w]e was going to take care of it." And she put this salve on it. And I'm thinking that they actually going to make sure that this is taken care of, and it wasn't. And, at that time, me and my daughters and them, we had gotten to the point where we had to go clean him. He was beginning to smell. His butt was getting worser. [sic]

When asked how often the Curahealth employees cleaned her son, she replied:

> Honestly, they didn't. I had to call them. I had a — my son had a buzzer in his room, where he can buzz them. And when I buzzed them, nobody really answered; so I buzzed again. And the lady asked me what I needed. I said I needed some help in cleaning my son. I said, "All I need y'all to do is just come and help." And eventually they came, but I had to walk down the hall from time to time to get them to come in there.

Ms. Kimble explained that "each day his backside was getting worser [sic] and he was laying in stool all the time." Further, Ms. Kimble identified a photograph sent to her by an unidentified Curahealth employee, who was upset because Mr. Kimble's backside was "broken down" and he laid in his stool all night until the morning staff took over.

Ms. Kimble was given two business cards of people to contact if she or Mr. Kimble had any problems at Curahealth: 1) Scott Thigpen, Director of Business Development, and 2) Kristy Caleyo, Chief Clinical Officer of Curahealth New Orleans. She testified that after contacting Mr. Thigpen, he said, "he would make sure that the stuff that was going on with my son would be taken care of." However, Ms. Kimble stated her son's condition worsened. She also contacted Ms. Caleyo, but conditions did not improve.

Mr. Kimble's medical expert, qualified in internal medicine with a specialty in long-term care practice, Dr. Robert Songy, testified that he was board-certified in internal medicine and had been at EJGH since 1979. Dr. Songy also oversaw the medical residents in the family practice program. At the time of the hearing, he had approximately 500 patients. In preparation for his testimony, he reviewed Mr. Kimble's EJGH and Curahealth medical records.[2]

Curahealth contends that Dr. Songy failed to establish the standard of care for Curahealth's nursing staff because he did not testify "as to the standards prevailing in the community or locale in which Curahealth's nursing staff practices under similar circumstances."

Dr. Songy testified that he had been at EJGH since 1979 or approximately forty years. He oversaw residents in the family practice program at EJGH. He also permits nurse practitioners from several universities to shadow him as part of their training. Dr. Songy practiced at a minimum of three local assisted living facilities and one local long-term care facility at the time of the hearing.

Dr. Songy was currently practicing in the area and had done so for decades. Accordingly, the trial court was satisfied that Dr. Songy was qualified to give testimony regarding the applicable standard of care. *See Piazza*, 601 So. 2d at 1379-82. We find no error in the decision of the trial court. *Benjamin v. Zeichner*, 12-1763, p. 9 (La. 4/5/13), 113 So. 3d 197, 204 ("The qualification of an expert witness rests within the sound discretion of the trial judge, and his determination will not be disturbed absent manifest error").

Dr. Songy testified that, according to the medical records, Mr. Kimble did

---

[2] Dr. Songy also reviewed Mr. Kimble's medical records from facilities where he received treatment after Curahealth, which are not central to this appeal.

not have any open wounds or skin breakdowns when he was transferred from EJGH to Curahealth. Mr. Kimble's sacral bedsore was first noted five days into Mr. Kimble's treatment at Curahealth. Dr. Songy briefly explained bedsores as follows:

> Well, bedsores, or decubitus ulcers, are very common. They occur mainly in areas where there is a bony prominence on the patient and a hard surface such as a mattress. And they occur because the pressure induces poor blood supply in the area of the skin. And in the right setting, primarily in the setting of malnutrition, poor nutrition, these areas break down, initially starting off like a blister or a red area on the skin, and then progressing to actually a hole that goes all the way down to the bone. And they are staged from Stage I, which is the blister, reddening area, to Stage IV, which is all the way down to the bone.
>
>      \*          \*          \*
>
> Once — once you get one of these sores — and I'll preface this by saying you have to gauge who is at risk for developing these sores. And Mr. Kimble was in the highest risk category for developing one of these bedsores. He essentially had no — not able to move himself, only had use of one extremity. So he couldn't turn himself, couldn't pull himself up or back. So he was pretty much at the mercy of the caregivers, who were supposed to be turning him to prevent a bedsore.
>
>      \*          \*          \*
>
> Once you develop it, a deep bedsore, especially if you're nutritionally impaired, it is very hard to get these things cured.

In regards to Mr. Kimble's colostomy, Dr. Songy stated:

> The likelihood — and the idea behind this is that the reason they do a colostomy is, if you have an open sore in the sacrum, which is right above the rectum, if you have an area there that's broken down and you're continually having it bathed in bowel movements, it will never heal. So the idea behind a colostomy is, instead of directing the bowel movements to the diaper, you direct it toward an ostomy bag on the front of the abdomen so your chances of getting the sore to heal are a lot better.

Dr. Songy "seriously doubt[ed]" that Mr. Kimble's colostomy would ever be

reversed.

As to preventing the creation of a bedsore, Dr. Songy opined:

> Well, he — and, again, I say he is at the highest risk for developing a bedsore because of his neurologic status. And then, on top of that, he was having difficulty swallowing. So he had really no way to get a lot of nutrition in to be able to heal up the bedsore. And, neurologically, he couldn't move himself back and forth to be able to keep pressure off of the bedsore. So because of that, he was at very high risk. And dealing with bedsores, nutrition is very, very important. Repositioning is important. The mattress that you have the patient on is equally as important, to be able to unload some of the pressure on these bony prominences to keep sores from developing.

After reviewing the Curahealth medical records, Dr. Songy believed that the nursing care Mr. Kimble received was not "very good." Specifically, Dr. Songy noted:

> The nursing care — there is no documentation that the patient was turned every few hours the way it typically is done in most institutions. Because these patients are at high risk, everybody knows the liability associated with a bedsore; so it's documented very carefully in the record that the patient is turned every two hours. And you can easily see that, in the record in this case, there's no documentation that it was ever done.

The following exchange occurred between Dr. Songy and counsel for Mr. Kimble:

> Q. What about the wounds on his heels? He had decubitus ulcers on his heels when he re-entered East Jefferson. Did you see any record at all of wound care to those wounds on his heels at Curahealth?
>
> A. No.
>
> Q. Were they even documented in the wound care record?
>
> A. No.
>
> Q. Those were also deep tissue wounds; correct?
>
> A. Yes.

13

Q. What does that say to you about the level of wound care he was receiving?

A. Not very good at all.

Dr. Songy testified that a wound like Mr. Kimble's remaining in feces, will never heal because it remains wet and infected. Further, Dr. Songy found that Curahealth's nutritional assessment and treatment of Mr. Kimble's malnutrition was "very poor."

Dr. Songy acknowledged that there were doctor's orders to turn Mr. Kimble every two hours, but that the orders were not complied with by Curahealth. Lastly, Dr. Songy testified that, within a reasonable degree of medical certainty, Curahealth and its staff breached the standard of care with regard to the medical care rendered to Mr. Kimble.

In addition to medical records and Mr. Kimble's affidavit, counsel for Mr. Kimble also admitted into evidence: 1) a letter stating that Curahealth was not a qualified healthcare provider, 2) evidence related to service of the Petition and the Motion and Order to Set Hearing for the Preliminary Default, 3) photos of Mr. Kimble, 4) the Medicaid lien for $245,891.81, and 5) the Curahealth business cards of Mr. Thigpen and Ms. Caleyo.

The Curahealth medical records reflect that during most twelve-hour shifts the Daily Nursing Assessment sheets ("DNA") contain a checked box signifying that Mr. Kimble was turned every two hours. However, the DNAs also contain a section entitled Daily Nursing Notes ("DNN") for nurses to document what times they took certain actions or interacted with the patient. None of the DNNs contain complete notations that Mr. Kimble was turned twelve times per twenty-four period or the corresponding times. During the length of Mr. Kimble's stay with

14

Curahealth, he should have been turned over 250 times. There are a fraction of entries in the DNNs noting that Mr. Kimble was either turned or refused to be turned.

The doctor consult notes from November 20, 2017, state that Mr. Kimble had "no rash is noted or other lesions." On November 23, 2017, the DNA contained the first entry that Mr. Kimble's buttocks were excoriated. The physical therapy and occupational therapy notes are replete with notes of Mr. Kimble's pain once the bedsore formed. Some of the therapists noted that they informed the nurses of Mr. Kimble's pain and bedsore.

After reviewing the evidence and testimony, we find that Mr. Kimble established the standard of care, Curahealth's breach of the standard of care, and that the breach caused his injuries. Accordingly, Mr. Kimble demonstrated the probability that he would likely prevail at a trial on the merits. Therefore, we do not find that the trial court committed manifest error by confirming the default judgment.

### *Future Medical Expenses*

Curahealth maintains that the trial court's award of $200,000.00 for future medical expenses lacked sufficient evidentiary support.

"The plaintiff bears the burden of proving special damages by a preponderance of the evidence." *Ronsonette v. St. Bernard Par. Gov't ex rel. Taffaro*, 14-0900, p. 4 (La. App. 4 Cir. 4/1/15), 165 So. 3d 209, 213. "It is well-settled that a judge or jury is given great discretion in its assessment of quantum, for both general and special damages." *Donaldson v. Hudson Ins. Co.*, 12-1013, p. 6 (La. App. 4 Cir. 4/10/13), 116 So. 3d 46, 51. Further, "[t]he assessment of quantum, or the appropriate amount of damages, by a trial judge or jury is a

determination of fact, one entitled to great deference on review." *Id.* "However, the discretion of the trier of fact to assess special damages, is narrower or more limited than the discretion to assess general damages." *Ronsonette*, 14-0900, p. 4, 165 So. 3d at 213.

"Future medical expenses, like other damages, must be established with some degree of certainty." *Hall v. Folger Coffee Co.*, 02-0920, p. 23 (La. App. 4 Cir. 10/1/03), 857 So. 2d 1234, 1250. "The proper standard for determining whether a plaintiff is entitled to an award of future medical expenses is 'proof by a preponderance of the evidence that the future medical expenses will be medically necessary.'" *Id.*, (quoting *Hoskin v. Plaquemines Parish Government*, 97-0061, pp. 4-6 (La. App. 4 Cir. 12/1/97), 703 So. 2d 207, 210-11). "When the record sufficiently establishes the need for future medical care, but not the exact cost of such care, 'the factfinder may make a reasonable award.'" *Hall*, 02-0920, p. 24, 857 So. 2d at 1250 (quoting *Lacy v. ABC Ins. Co.*, 97-1182, p. 13 (La. App. 4 Cir. 4/1/98), 712 So. 2d 189, 196).

Our role, as previously espoused by this Court, is as follows:

> An appellate court, in reviewing a judge's factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong. *Id.* Where two permissible views of the evidence exist, the fact-finder's choice cannot be manifestly erroneous or clearly wrong.

*Ronsonette*, 14-0900, p. 4, 165 So. 3d at 214.

Dr. Songy testified that the decubitus ulcer would likely never heal. In fact, at the time of the hearing to confirm the default judgment, Mr. Kimble was hospitalized because the wound was infected. This demonstrates that Mr. Kimble

will likely need medical care for the decubitus ulcer for the remainder of his life and he is only thirty-four years old. The Medicaid lien from May 30, 2019, was $128,360.74, while the updated Medicaid lien presented at the hearing, dated December 4, 2019, was $245,891.81. Further, the transcript from the hearing reflects that the trial court understood it was assessing future medical expenses for general treatment purposes, as opposed to costs for a reversal of the colostomy. Given the possible length of medical treatment Mr. Kimble may require for his wound care the rest of his life and expenses incurred for same up to this point, we find the $200,000.00 award for future medical expenses reasonable. The trial court did not err.

## DECREE

For the above-mentioned reasons, we find that the assertions by Curahealth regarding the lack of service are governed by the law of the case doctrine and lack merit. We do not generally address issues raised for the first time on appeal. As such, the trial court's admittance of Curahealth's medical records for Mr. Kimble remains intact. We find that Dr. Songy established the standard of care and that Mr. Kimble produced evidence sufficient to establish that he would likely prevail at a trial on the merits. Therefore, the trial court did not err by finding he proved a prima facie case and confirming the default judgment. Lastly, we find the $200,000.00 award for future medical expenses was reasonable based on the facts and circumstances of this case. The judgment of the trial court is affirmed.

**AFFIRMED**